## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| A.D., by his guardian and next friend, MARY B. VALENCIA, and INDIVIDUAL ADVOCACY GROUP, INC., an Illinois not-for-profit corporation, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | No.  16-3331 |
| v. | ) ) | JURY TRIAL DEMANDED |
| CITY OF SPRINGFIELD, ILLINOIS, an Illinois municipal corporation, | ) ) ) | |
| Defendant. | ) | |

### COMPLAINT

I.  <u>INTRODUCTION</u>

1.      This is an action for declaratory and injunctive relief and for damages brought pursuant to the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, as amended ("FHA"), 42 U.S.C. § 3601 *et seq*., Titles II and V of the Americans with Disabilities Act ("ADA"), 42 U.S. C. § 12101 *et seq*., and its implementing regulation 28 C.F.R. Part 34, and Section 504 of the Rehabilitation Act of 1973 (Section 504), as amended, 29 U.S.C. § 794 *et seq*., and its implementing regulation 24 C.F.R. Part 8.  Defendant City of Springfield, Illinois (the "City") discriminated against Plaintiffs on the basis of disability as follows: 1) by imposing a zoning ordinance including a 600' spacing requirement between group homes that discriminates of its face and has a disproportionately adverse effect on disabled individuals; 2) by intentionally and wrongfully denying the conditional permitted use application submitted by Plaintiff Individual Advocacy Group, Inc. ("IAG"); and 3) by refusing to make the reasonable accommodations to its rules, policies, and practices necessary to afford Plaintiffs and other individuals with disabilities an equal opportunity to live in a residential neighborhood.  Under

1

these discriminatory policies, the City prevented the continued operation of a small community home that houses three individuals with developmental disabilities, including Plaintiff A.D.  As such, Defendant City engaged in a practice of discrimination on the basis of disability in violation of the FHA, the ADA and Section 504.

## II.     JURISDICTION AND VENUE

2.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343; 42 U.S.C. §§ 12133 and 12134; and 42 U.S.C. § 3613.  Appropriate declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

3.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the Defendant resides in this judicial district and because a substantial part of the events and omissions giving rise to the Plaintiff's claims occurred in the judicial district.

## III.    PARTIES

4.     Individual Advocacy Group, Inc. is a not-for-profit corporation, organized and existing under the laws of the State of Illinois, with its principal place of business located at 1289 Windham Pkwy., Romeoville, IL 60446.  Its CEO/Executive Director is Dr. Charlene A. Bennett, Ed. D.

5.     Plaintiff A.D. is a 62-yr. old adult person who resides in Sangamon County, Illinois.  He is developmentally disabled and is a "handicapped" person within the meaning of 42 U.S.C. § 3602(h). and a "qualified person with a disability" within the meaning of the ADA 42 U.S.C. Section 12131(2).  Plaintiff A.D. has been determined to be incompetent, so he brings this action by his next friend and legal guardian, Mary B. Valencia.  Ms. Valencia is his sister, and she also resides in Sangamon County, Illinois.

6.      Defendant City of Springfield, Illinois ("Defendant" or "the City") is a city within the Central District of Illinois that is organized under laws of the State of Illinois and is a body politic and corporate.  The City is a "public entity" within the meaning of the ADA, 43 U.S.C. Section 12131(1).

## IV.   STATEMENT OF THE CASE

### Defendant City's Zoning Ordinance

7.      Defendant exercises zoning authority over land within its boundaries, including the tract of real property at 2328 Noble Ave. ("the Noble home") that is the subject of the Conditional Permitted Use ("CPU") application described herein.  Defendant's zoning ordinances include the following:

SECTION 155.001 – Definitions.

**Family.**  One or more persons each related to one another by blood, marriage, or adoption, or is a group of not more than five persons not all so related occupying a single dwelling unit which is not a boardinghouse or lodging house as defined in this section.

**Family care residence.**  A single dwelling unit occupied on a relatively permanent basis in a family-like environment by a group of no more than **six** unrelated persons with disabilities, plus paid professional support staff provided by a sponsoring agency, either living with the residents on a 24-hour basis or present whenever residents with disabilities are present at the dwelling, and complies with the zoning regulations for the district in which the site is located.

SECTION 155.053 – Family care residence and group community residence.

In order to ensure that community residences, which operate most effectively in residential environments, do not adversely affect those environments through over concentration or improper operation, no facility shall be operated in a residence district unless:

(a) It is located upon a zoning lot which is more than 600 feet from the property line of any other such facility; and
(b) It is licensed or approved by the State of Illinois.
(c) Any family care residence or group community residence not in compliance with either provision (a) or provision (b) above may seek a conditional permitted use under section 155.187 of the zoning ordinance.

SECTION 155.211.1 – Family community residence or group community residence.

Any family community residence or group community residence not in compliance with section 155.053 of this zoning ordinance may be eligible for a conditional permitted use from the city council after establishing the following findings:

(a) Petitioners shall demonstrate that the proposed location and use will not have any adverse impact upon residents of nearby facilities when located within 600 feet of another such facility; and

(b) The proposed location will not have any detrimental affect (sic.) upon existing privacy, light or environment of surrounding residences.

*IAG's community residences in Springfield*

8.      IAG is a nonprofit agency that provides residential services in integrated settings to adults with developmental disabilities. It supports adults with disabilities in approximately 95 different community settings in Illinois. One of the homes where IAG provides 24-hr. in-home support for three individuals with disabilities, including Plaintiff A.D., is located at 2328 Noble Ave., Springfield, Illinois ("the Noble home").

9.      IAG's philosophy for providing residential services is exclusively client-centered. IAG does not own or rent group homes. Rather, IAG provides in-home services when parents or guardians rent a home for their relative in their preferred location. Then staff from IAG support the individuals so they can continue to live in the community. These services include, among others, assistance in dressing, food preparation, shopping, home maintenance and cleaning, and supporting social relationships in the home and in the community. IAG enters into written agreements with landlords to pay any security deposit, if necessary, once the person's parent or guardian signs the lease, and further agrees to supply a new tenant in the event of tenant turnover at the home.

4

10.     All of the individuals who are supported by IAG at the Noble home have a physical or mental impairment that originated before age 18 and substantially limits one or more of such person's major life activities, such as an intellectual disability, cerebral palsy, epilepsy or autism spectrum disorder. Two of the residents of the Noble home, including Plaintiff A.D., are non-ambulatory and use a wheelchair for mobility.

11.     Each of the residents of the Noble home requires assistance to perform activities of daily living, like bathing, dressing, eating, and managing their medical needs. IAG staff are present at all times the residents are present in their home. Due to their disabilities and the level of in-home support they require, each of the residents of the Noble home have very few, if any, residential alternatives.

12.     In addition to residential services, IAG also serves disabled persons in its day treatment program in Springfield, Illinois. The day treatment program, known as the Continuing Education Center, provides services to assist persons with disabilities learn skills for living in the community. Two of the residents of the Noble home participate in this program. Plaintiff A.D. no longer attends day programs because of his age and infirmities, so he generally spends all of his time at the Noble home or with his family.

13.     All of the Noble home residents served by IAG have incomes limited to Social Security Disability Income or Supplemental Security Income ("SSI"). Plaintiff A.D.'s only source of income is SSI.

14.     Providing supportive housing to individuals with developmental disabilities is an important part of IAG's mission. When a person with a developmental disability grows older or suffers impairments that interfere with activities of daily living, IAG's goal is to maintain the person in an integrated residential setting in their home community rather than in an institution, a

nursing home, or even a large group home. IAG's residential services program provide the only means by which most of its clients can live in the community, either because they need supportive services, for financial reasons, or both.

15.     Funding from the Illinois Department of Human Services is available to IAG to support persons with developmental disabilities pursuant to the Community Integrated Living Arrangement ("CILA") program. The CILA program is a Home and Community-Based Services Waiver Program funded in part by Medicaid, 42 U.S.C. § 1396n(c)(1), and is designed to permit persons with developmental disabilities who would otherwise be eligible to reside in institutions to live in the community. All the residents of the Noble home participate in the CILA program. The Illinois Department of Human Services regulates and certifies group homes for persons with developmental disabilities in the CILA program, including inspections of these homes at regular intervals to ensure compliance with Medicaid requirements, fire safety requirements, and other state regulations. At all times relevant herein, the Noble home was and is fully complaint with all federal and state rules and regulations, including its rules regarding spacing requirements between group homes.

16.     In about August 2012, IAG was invited by several parents of persons with disabilities to come to Springfield and offer services to their relatives and friends. Initial services provided by IAG were limited to helping place persons with disabilities with house parents in the Springfield area. Thereafter IAG made arrangements with several property owners, including Christine and Robyn Hovey, owners of the Noble home, to assist small groups of persons with disabilities to rent dwellings in Springfield.

17.     Christine and Robyn Hovey purchased the real estate located at 2328 Noble Ave. in Springfield in August 2013. The Hoveys formed a corporation, Professional Residences, Inc.,

6

to own the property. The home is an attractive one-story ranch house with three bedrooms, three

baths, and 2083 sq. ft. of living space, as well as an attached garage. It is located in a

neighborhood zoned R-1, a single-family residence district. This home was very desirable to the

Hoveys because it was a mid-century modern home that was very accessible; the Hoveys thought

of it as a place where they could potentially retire. When the Hoveys learned that the home might

be leased and occupied by persons with mobility impairments, they agreed to widen certain

doorways, enlarge two bathrooms in order to accommodate a wheelchair, and lower the counters

in the kitchen and construct a kitchen island so persons in wheelchairs could pull up to the

kitchen table.

18.    The Noble home is compatible with other land uses in the area. It resembles other

single-family residences in the neighborhood in every respect. From the exterior of the home,

there is nothing to indicate the home is occupied by persons with disabilities. The staff who

work there do not drive vehicles that identify the home as a place where people with disabilities

reside. IAG staff park their cars in the driveway or on the street in front of the home. Generally,

there are no more than two staff cars at the premises except during a shift change, when there

may be three cars.

19.    The Hoveys signed leases with three persons, including Mary Valencia on behalf

of Plaintiff A.D., in March 2014. Theses residents, including Plaintiff A.D., intended for the

Noble home to be their permanent residences where they will live for the rest of their lives.

20.    All of the residents of the Noble home, including Plaintiff A.D., live together as a

family unit, sharing meals as well as recreational and leisure activities. Plaintiff A.D. is very fond

of the two other residents as well as the IAG staff who work at the home.

21.    Plaintiff A.D. has a severe intellectual disability, Parkinson's disease, a seizure disorder, congestive heart failure and hypertension, among other disorders. He ambulates with use of a wheelchair and is almost totally nonverbal.

22.    Before moving to the Noble home, Plaintiff A.D. resided in a variety of institutional placements, including the Jacksonville Developmental Center, a group home in Rolla, Missouri, where he was the victim of physical abuse, a group home operated by Sparc in Springfield, and most recently at the Murray Developmental Center in Centralia. Plaintiff A.D.'s mother, Mary Fitzgerald, who is also a Springfield resident, regularly visited Plaintiff A.D. wherever he lived. Plaintiff A.D. left the Sparc home after suffering from an unexplained behavioral meltdown that resulted in a psychiatric hospitalization, following which no one had a better residential option for Plaintiff A.D.'s family than Murray. While at Murray, where he lived for almost a decade, Plaintiff A.D. resided in Grape Cottage, a 20-bed unit that housed men who also had severe intellectual disabilities. He lived in a room with one other resident. He almost never left the Murray Center unless a family member was able to take him off the premises. His family was concerned that Plaintiff A.D. was often just parked in a corner in his wheelchair at Murray, with no activities and no attention from staff or other residents.

23.    Sometime in 2012, Mary Valencia was contacted by a social worker from the Murray Center who told her that the Center may soon close. She was asked if she'd be interested in finding a home outside the facility for Plaintiff A.D. Ms. Valencia searched for almost a year for a home in Springfield that was fully accessible and where staff would be responsive to Plaintiff's A.D.'s needs and her family's concerns. She visited several IAG homes in the Springfield area and was eventually satisfied for Plaintiff A.D. to move from Murray to the Noble home.

24.     After the move, Plaintiff A.D. has regained skills and abilities that he lost while a resident of Murray. Now he is able to walk a few steps, to stand upright, and to transfer to and from his wheelchair, which he didn't do at Murray. Instead of being spoon-fed, as he had been at Murray, he is able to eat independently with the help of adaptive kitchen utensils. He is able to make choices about what he eats. He has his own room, which he never had before. He now smiles a lot. He looks forward to regular visits from his sister, Mary Valencia, and from his mother, who currently lives in an assisted living facility but can still see Plaintiff A.D. occasionally. Plaintiff A.D.'s family is very well-pleased with his home on Noble Avenue.

*The Zoning Dispute - Noble Home*

25.     The Noble home opened in March 2014. From the time of its opening until the present, there were never any problems reported at the home. Several months after opening, the Hoveys and IAG learned that a group home operated by Sparc, a nonprofit agency that also serves persons with developmental disabilities, was located across the street. A Sparc resident began to wander down the street and enter the Noble home uninvited, and it took some time to change this behavior. IAG then learned that the Sparc group home had been located in the neighborhood for about twelve years. From the street, the Sparc home also is indistinguishable from other homes in the area. Other than the foregoing uninvited guest, the residents of the Sparc group home have never interacted with Plaintiff A.D. or the other persons who live at the Noble home, and the residents and operators of the Sparc home have never interacted with the Hoveys or IAG.

26.     After purchasing the Noble home and leasing to the three persons who now live there, neither the Hoveys nor IAG ever received a complaint concerning conditions at the

premises or the occupancy of the residents. There have never been any police, fire, or emergency calls at the home since March 2014.

27.     In August 2016, the Hoveys received a complaint from Matthew McLaughlin, the City of Springfield Zoning Administrator.  He told them a complaint had been filed because the Noble home was located within 600' of an existing group home.  The Hoveys do not know who made the complaint and McLaughlin wouldn't tell them.  McLaughlin told Christine Hovey that the residents would have to leave because the Noble home was "second on the block."  He said that their only option to maintain the home was to apply to the Zoning and Planning Commission of the City for a Conditional Permitted Use ("CPU") under the City's Zoning Code.

28.     On October 7, 2016, the Hoveys and IAG submitted a joint application for a CPU to the City's Zoning and Planning Commission, including a request for a reasonable accommodation for the City's rules, policies and practices, including its Zoning Code, if the application for a CPU could not be granted.

29.     On or about Nov. 10, 2016, the Springfield-Sangamon County Regional Planning Commission recommended denial of the CPU application because, among other reasons, there was "insufficient detail to allow staff to make a reasonable determination whether the proposed location will have any detrimental affect (sic.)" on the character of the surrounding area.  On or about Nov. 14, 2016, the City Engineer submitted a report offering no objection to the proposed CPU application.

30.     On November, 16, 2016, a hearing was held by the Zoning and Planning Commission regarding the CPU application.  The public hearing lasted more than two hours.

31.     Witnesses testifying on behalf of the Plaintiff/applicants for the CPU included Dr. David Brooks and Dr. Charlene Bennett from IAG, Christine Hovey, the owner of the Noble

home, Lorraine Iocca, the mother and guardian of another resident of the home, and Daniel
Lauber, a land use expert witness who testified about the impact of the Noble home on the
neighborhood. The gist of their testimony was the following:

a) Brooks and Bennett testified that IAG didn't know the Sparc group home was located
nearby when the Noble home opened. They testified that the residents had individual
leases with the property owners but IAG provided in-home services each day to the
residents. They testified that there were no contacts between them or the residents and
anyone associated with the Sparc group home.

b) Brooks and Bennett further testified about the family atmosphere of the Noble home, to
the effect that this was the permanent home of the residents and that this home was like
their family. They explained that the quality of life changed of the Noble home residents
changed when they moved out of institutions into their own home, where now they had
their own room, their own television and radio, and their own personal items. Bennett
testified that there had been no turnover at the home, but if there were turnover, any new
resident would have to be approved by the remaining two residents.

c) Christine Hovey testified that, when she and her husband purchased the property, they
were unaware that the Noble home was located on the same block as the Sparc group
home. She said they bought the home for purposes of investment, with the eventual goal
of possibly living in this home when they retired. She also testified to the extensive
renovations to the home they'd made so that it would be fully accessible to residents with
mobility impairments.

d) Lorraine Iocca testified that she is the mother and legal guardian of one of the Noble
home's residents, J. D. She testified that J.D. previously lived at Brother James Court, a

11

100-bed intermediate care facility for persons with developmental disabilities in Springfield where he shared a bedroom with three other men and where he was very unhappy. After great difficulty, because so few facilities are fully accessible, Ms. Iocca testified that she finally located IAG. Since 2014, when her son moved into the Noble home, she has been extremely satisfied with her son's home and he has been very happy and satisfied with his living situation. She testified that J.D. has nowhere to live other than a nursing home or another large intermediate care facility if the Noble home has to close.

e) Daniel Lauber testified as an expert witness in the area of land use planning and zoning for group homes, based on his 42-year experience in researching the impacts of group homes for persons with disabilities, his Illinois study of the impacts of group homes on property values and home sales, and his visit to the Noble home. He testified that the Noble home should be treated as a "family" under the city's zoning code and should not require zoning approval because it operated in all respects like a functional single family home and less than five persons reside in the home. He testified that the City of Springfield previously agreed in litigation that an "Oxford House" sober home for recovering addicts and alcoholics should be treated as a "family" under its zoning code, without requiring any zoning approval, if less than five persons resided in the home. He testified that the Noble home had no adverse impact on neighborhood property values, home sales, increased crime, or increased traffic, and was consistent with the City's comprehensive plans. He testified about his research about the impact of group homes and his sample of more than 50 professional studies about group homes, all demonstrating that group homes have little or no impact on the quality of residential

neighborhoods. Finally, he testified that allowing a reasonable accommodation to permit the Noble home's continued operation would not fundamentally alter the City's zoning scheme or create an undue financial burden on the City.

32.　Three neighbors of the Noble home appeared at the hearing to complain about the CPU application. They submitted a petition signed by at least thirty other neighbors in opposition to the application, claiming the home caused unexplained "disruption in our neighborhood." The complaints of these witnesses were mostly unrelated to the operation of the Noble home and were based upon groundless fear of persons with disabilities. For example, the neighbors testified that nobody asked them if the Sparc group home or the Noble home could locate on their block and that they had been misled by the Hoveys about the proposed use of the home. They testified that its proximity to the Sparc home was a "zoning violation." Neighbors testified that the Sparc home "fractured" theeir cohesive neighborhood community twelve years ago and that the Noble home would perpetuate this problem. The neighbors' principal complaint was that staff from the two homes "raced up and down the street" at shift changes, played loud music, and parked their cars in front of neighbors' homes and driveways. A neighbor testified about a staff person "making out" in a car parked the driveway of one of the homes. Left unsaid was that all the witnesses and most of the persons who live on the street are Caucasian and the staff who work at the homes are mostly African American. The neighbors did not identify which home, either the Sparc home or the Noble home, was the source of their complaints. Staff who work at the Noble home do not race their cars on the street, play loud music in their cars, or park in front of the home of any of the neighbors.

33.   A realtor also testified in opposition to the CPU application. She stated that she recently sold the home immediately north of the Noble home. She did not testify that the presence of the Noble home caused any delay in the sale of the home or any reduction in its sale price. She testified that the owner of that home moved to Florida a year earlier "to get away from the Noble home." She said she held an open house during the week, rather than on a weekend, so that prospective buyers of the home next door would not see the residents of the Noble home. She testified that a resident of the Noble home yelled something very loudly at her during the open house and she was concerned about the safety of children and families who might live next door.

34.   The realtor's testimony was not believable. The only resident who was present during the day of her open house was Plaintiff A.D. His entire vocabulary consists of three phrases: "bang bang," "ho ho" and "et-choo." He cannot say anything loudly. He has never said anything to anyone in a threatening manner and he has never done anything to threaten another person.

35.   At the conclusion of the hearing, the Commission voted 4-3 to uphold the recommendation of the Regional Planning Commission and deny the CPU. The Recommendation of the Planning & Zoning Commission was that "the evidence adduced at the hearing did not support the proposition that the adoption of the proposed request is in the public interest." Specifically, the Commission found that "[t]he evidence provided in the petition and its exhibits does not include sufficient detail to allow staff to make a reasonable determination whether the design and method of operation of the proposed use will minimize the adverse effects on the character of the surrounding area" and "whether the proposed

14

location will have any detrimental effect of the listed factors," such as existing privacy, light or environment of surrounding residences.

36.     The rationale for the City's decision was based in part on the opinion of the Assistant City Corporation Counsel, who announced at the hearing that the Noble home was not a "family" according to the City's zoning code because the residents require paid professional support staff on a 24-hr. basis. Counsel stated that IAG and the Hoveys could have advised the City of their intention to open this home in advance so they would be apprised of the City's 600' spacing requirement between group homes. At the hearing, Dr. David Brooks, an IAG witness, testified that the Illinois Department of Human Services will not disclose the location of group homes for persons with developmental disabilities. A witness from the City Zoning and Planning Commission then testified that the City has no record or list of the location of any group home in the City. Nevertheless, the Zoning and Planning Commission insisted that the CPU requirement was applicable in this case.

37.     On December 20, 2016, the Springfield City Council voted 8-2 to uphold the decision of the Zoning and Planning Commission and deny the application for a CPU. Despite another request for a reasonable accommodation from the rules, policies and practices of the City, including its Zoning Code, the Council did not mention this request in its discussion or its decision. In explaining their vote, several City Council members stated that the parents and guardians of the residents of the Noble home and the City of Springfield were all "victims," because IAG failed to perform its due diligence in locating the Noble home too close to the Sparc home. Multiple Council members explained that a "precedent" had been set by the denial of a CPU application for another group home in Springfield that

was located within 600' of a Sparc group home in August 2016, and the Council now had to act consistently with this application.

38.     Plaintiffs are informed and believe that at least two of the residents of the Noble home will now have to vacate within 30 - 90 days.  Plaintiff IAG is not aware of an accessible dwelling in the Springfield area that Mary Valencia, Plaintiff A.D.'s guardian, or the other parents and guardians, can lease on behalf of their disabled relatives.  Ms. Valencia is afraid that her brother will severely decompensate if he is forced to move elsewhere because he reacts so badly to change.

39.     *Defendant City of Springfield's Violations of the FHA, ADA, and Section 504 of the Rehabilitation Act*

40.     Defendant City of Springfield intentionally discriminated against Plaintiffs because the residents of the Noble home are disabled.

41.     Defendant's Zoning Ordinance has a disparate impact on people with disabilities who require a community-based, residential facility in order to avoid institutionalization.

42.     Under Defendant's Zoning Code, homes like the Noble home are not permitted uses in an R-1 district if they are located within 600' of an existing group home, whereas groups of five or fewer unrelated adults can live anywhere in any residential district.  On its face, this restriction prevents group homes from opening and operating in residential neighborhoods in the City, especially since there is no reliable way for a real estate owner or a provider of residential services to persons with disabilities to discover the location of any other group homes within the City.

43.     Defendant refused to grant a reasonable accommodation to permit continued operation of the Noble home when it denied Plaintiff's CPU application and request for a

reasonable accommodation. Such an accommodation to its rules, policies, and practices, including its zoning code, was necessary to afford Plaintiffs and other individuals with disabilities an equal opportunity to use and enjoy a dwelling in a residential neighborhood.

44. The accommodations requested would not have imposed an undue administrative burden or expense upon Defendant and would not have resulted in a fundamental alteration of Defendant's Zoning Code or any other program or activity of the City, since the Noble home is fully compatible with the residential character of the neighborhood.

## V.   CAUSES OF ACTION

### COUNT ONE: FAIR HOUSING ACT

45. The allegations listed above are incorporated herein by reference.

46. The Noble home is a "dwelling" within the meaning of 42 U.S.C. § 3602(b).

47. The residents of the home, including Plaintiff A.D. are "handicapped" within the meaning of 42 U.S.C. § 3602(h).

48. Because the Springfield City Council is vested with the final authority for zoning decisions, the City Council's actions described above constitute the policy of Defendant City of Springfield and were taken under color of state law.

49. Defendant City of Springfield's actions described above constitute:

a. discrimination in the sale or rental, or otherwise making unavailable or denying a dwelling because of disability in violation of the FHA, 42 U.S.C. §3604(f)(1);

b. a refusal to make reasonable accommodations in rules, policies, practices or services when such accommodations may be necessary to afford a person an equal opportunity to use and enjoy a dwelling in violation of the FHA, 42 U.S.C. §3604(f)(3)(B); and

17

      c.     interference with the rights of persons in the exercise or enjoyment of, or on account of their having exercised or enjoyed, or on account of their having aided or encouraged persons with disabilities in the exercise of enjoyment of rights granted or protected by the FHA in violation of 42 U.S.C. §3617.

50.     Defendant's actions described above were intentional and taken with willful disregard for Plaintiffs' rights.

51.     Plaintiffs are aggrieved persons, as defined in 42 U.S.C. § 3602(i), who have suffered economic loss, emotional distress, and loss of their civil rights as a result of Defendant's conduct.

52.     Plaintiffs are without an adequate remedy at law.

53.     Plaintiffs will suffer irreparable harm if Defendant refuses to grant the CPU or other permits necessary to permit continued operation of the Noble home.

54.     WHEREFORE, Plaintiffs pray that this Court enter an ORDER:

      a.     Declaring the Defendant's actions violate the Fair Housing Act;

      b.     Granting a preliminary and permanent injunction enjoining Defendant to issue the CPU or other permits necessary to permit continued operation of the Noble home and to refrain from eviction proceedings against residents of the Noble home during the pendency of this proceeding;

      c.     Awarding Plaintiffs such damages as would fully compensate them for their injuries caused by Defendant's discriminatory housing practices;

      d.     Awarding Plaintiffs their costs, expenses, and reasonable attorney's fees; and

      e.     Granting any additional relief as the Court deems just and proper.

## COUNT TWO: AMERICANS WITH DISABILITIES ACT

55.     The allegations listed above are incorporated herein by reference.

56.     The prospective residents of the home, including Plaintiff A.D., are "qualified individuals with a disability" within the meaning of 42 U.S.C. § 12131(2) and 28 C.F.R. § 35.104.

57.     Defendant City of Springfield is a "public entity" within the meaning of 42 U.S.C. § 12131(1).

58.     Defendant's zoning activities, including the enactment of zoning ordinances; administrative processes, hearings, findings, and recommendations by either its Zoning Administrator or its Planning and Zoning Commission; and decisions by its City Council, are "services, programs, or activities" of a public entity within the meaning of 42 U.S.C. § 12132.

59.     Defendant City of Springfield's actions described above:

        a.      constitute discrimination in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. Part 35;

        b.      exclude qualified individuals with disabilities from participation and deny them the benefits of the services, programs, or activities of a public entity on the basis of disability in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. § 35.130(a);

        c.      afford qualified individuals with disabilities an opportunity to participate in or benefit from the services of a public entity that are not equal to those afforded others in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. § 35.130(b)(1)(ii);

d.       otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. § 35.130(b)(1)(vii);

e.       fail to make reasonable modifications in policies, practices, or procedures necessary to avoid discrimination on the basis on disability in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. § 35.130(b)(7);

f.       utilize methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination of the basis of disability in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. § 35.130(b)(3);

g.       exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. § 35.130(g); and

h.       interfere with an individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the ADA in violation of Title V of the ADA, 42 U.S.C. § 12203(b)

60.      Defendant's actions described above were intentional and taken with willful disregard for Plaintiffs' rights.

61.      Plaintiffs are "person[s] alleging discrimination on the basis of disability" within the meaning of 42 U.S.C. § 12133 who have suffered harm and damages by Defendant's actions described above.

62.    Plaintiffs are without an adequate remedy at law.

63.    Plaintiffs will suffer irreparable harm if Defendant refuses to grant the CPU or other permits necessary to allow continued operation of the Noble home.

64.    WHEREFORE, Plaintiffs pray that this Court enter an ORDER:

a.    Declaring the Defendant's actions violate the American's with Disabilities Act and its implementing regulations;

b.    Granting a preliminary and permanent injunction enjoining Defendant to issue the CPU or other permits necessary to allow continued operation of the Noble home in the City of Springfield and to refrain from eviction proceedings against residents of the Noble home during the pendency of these proceedings;

c.    Awarding Plaintiffs such damages as would fully compensate them for their injuries caused by Defendant's discriminatory housing practices;

d.    Awarding Plaintiffs their costs, expenses, and reasonable attorney's fees; and

e.    Granting any additional relief as the Court deems just and proper.

### COUNT THREE: SECTION 504 OF THE REHABILITATION ACT

65.    The allegations listed above are incorporated herein by reference.

66.    The Defendant City of Springfield is a recipient of federal financial assistance.

67.    The residents of the home, including Plaintiff A.D., are "qualified individuals with a disability" within the meaning of 29 U.S.C. § 794(a).

68.    Defendant's zoning activities, including the enactment of zoning ordinances; administrative processes, hearings, findings, and recommendations by either its Zoning Administrator or its Zoning and Planning Commission, and decisions by its City Council, are

"programs or activities" of a unit of local government within the meaning of 29 U.S.C. § 794(b)(1)(A).

69.    Defendant City of Springfield's actions described above:

a.    constitute discrimination in violation of Section 504 of the Rehabilitation Act of 1973 as amended, 29 U.S.C. § 794, and its implementing regulation, 24 C.F.R. Part 8;

b.    exclude qualified individuals with disabilities from participation in and deny them the benefits of the services, programs, or activities receiving federal financial assistance on the basis of disability others in violation of Section 504, 29 U.S.C. § 794, and its implementing regulation, 24 C.F.R. 8.4(b)(1)(i);

c.    afford qualified individuals with disabilities an opportunity to participate in or benefit from the services, programs, or activities receiving federal financial assistance that are not equal to those afforded others in violation of Section 504, 29 U.S.C. § 794, and its implementing regulation, 24 C.F.R. 8.4(b)(1)(ii);

d.    otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service in violation of Section 504, 29 U.S.C. § 794, and its implementing regulation, 24 C.F.R. 8.4(b)(1)(viii); and

e.    fail to make reasonable modifications in policies, practices, or procedures necessary to avoid discrimination on the basis of disability in violation of Section 504, 29 U.S.C. § 794, and its implementing regulations, 24 C.F.R. § 8.3, 24 C.F.R. 8.24, 24 C.F.R. § 8.28, and 24 C.F.R. § 8.33.

70.    Defendant's actions described above were intentional and taken with willful disregard for Plaintiffs' rights.

71.     Plaintiffs are "persons aggrieved" within the meaning of 29 U.S.C. § 794a(a)(2) who have suffered harm and damages by the actions of Defendant described above.

72.     Plaintiffs are without an adequate remedy at law.

73.     Plaintiffs will suffer irreparable harm if Defendant refuses to grant the CPU or other permits necessary to allow the continued operation of the Noble home in Springfield, Illinois.

74.     WHEREFORE, Plaintiffs pray that this Court enter an ORDER:

a.      Declaring the Defendant's actions violate Section 504 of the Rehabilitation Act and its implementing regulations;

b.      Granting a preliminary and permanent injunction enjoining Defendant to issue the CPU or other permits necessary to allow the continued operation of the Noble home in Springfield, Illinois and to refrain from eviction proceedings against residents of the Noble home during the pendency of these proceedings;

c.      Awarding Plaintiffs such damages as would fully compensate them for their injuries caused by Defendant's discriminatory housing practices;

d.      Awarding Plaintiffs their costs, expenses, and reasonable attorney's fees; and

e.      Granting any additional relief as the Court deems just and proper.

## JURY DEMAND

75.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs respectfully

demand a trial by jury on all issues triable by a jury.

Law Offices of Thomas E. Kennedy, III, L.C.

By: */s/ Thomas E. Kennedy III*
Thomas E. Kennedy, III (lead counsel)
Sarah Jane Hunt
906 Olive St., Ste. 200
St. Louis, MO 63101
(314) 872-9041
(314) 872-9043 fax
tkennedy@tkennedylaw.com
sarahjane@tkennedylaw.com