THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| MARY B. VALENCIA, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:16-cv-03331 |
| | ) | |
| CITY OF SPRINGFIELD, ILLINOIS, | ) | |
| | ) | |
| Defendant. | ) | |
| | | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:17-cv-03278 |
| | ) | |
| CITY OF SPRINGFIELD, ILLINOIS, | ) | |
| | ) | |
| Defendant. | ) | |

## UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the United States of America hereby moves for partial summary judgment as to the liability of the defendant, the City of Springfield, Illinois.

## INTRODUCTION

In 2016, the City of Springfield ("City") refused to grant a zoning permit to allow a small group home for three men with intellectual and physical disabilities to remain open. This Court granted a preliminary injunction against the City, finding that the plaintiffs were likely to succeed in showing that Springfield had violated the Fair Housing Act ("FHA") by discriminating on the basis of disability, and the Seventh Circuit affirmed. Now, with the benefit

of a full record, it is clear that the Courts' predictions were correct. The City admits that it "discriminated against the residents of the group home . . . on the basis of their disability in violation of federal law." And this admission, coupled with other undisputed evidence in the record, establishes that Springfield violated the FHA. As a matter of law, this conduct constitutes both a "pattern or practice" of discrimination and a denial of rights to a group of persons that raises an issue of general public importance. Accordingly, the Court should grant summary judgment to the United States as to Springfield's liability and order the City to submit a plan to remediate its violations.

## UNDISPUTED MATERIAL FACTS

### A. The Group Home at 2328 S. Noble Ave.

1.     In 2014, a service provider called Individual Advocacy Group ("IAG") began operating a group home for three persons with disabilities located at 2328 S. Noble Ave., in a residential zoning district in Springfield. Bennett Decl. ¶ 11 (ECF No. 8-1), attached as Ex. 3.[1] IAG is licensed to provide these services by the State of Illinois through the Illinois Department of Human Services. *Id.* ¶ 8.

2.     The home at 2328 S. Noble Ave. is a Community Integrated Living Arrangement ("CILA") and, as such, it is approved, licensed, funded, and overseen by the State of Illinois. Bennett Dep. as Rule 30(b)(6) Designee for IAG ("Bennett 30(b)(6) Dep.") 95:3–96:13, attached as Ex. 4[2]; Am. Answer to U.S. Compl. at 28 ¶ 6 (ECF No. 57) ("Am. Answer"), attached as Ex.

---

[1] For the convenience of the Court, the United States has attached certain previously filed materials as exhibits to this Motion.

[2] By agreement of the parties and in accordance with Fed. R. Civ. P. 5.2, Local Rule 5.11(A), and the Stipulated Protective Order (ECF No. 51), the United States has redacted certain personally identifying information from its exhibits and refers to the residents of 2328 S. Noble Ave. using only their initials.

5.  The CILA program is the means by which, through Medicaid, the State of Illinois provides community-based residential services to persons with intellectual disabilities.  *See* Ill. Admin. Code tit. 59, pt. 115.  Its purpose is to enable persons with intellectual disabilities to live in the community rather than in institutional settings, in order to "promote optimal independence in daily living and economic self-sufficiency of individuals with a mental disability."  *Id.* § 115.100(b).  CILAs are permitted to have up to eight residents.  *Id.* § 115.300(c)(2).

3.      As a licensed CILA, 2328 S. Noble Ave. must "be typical of homes in the community and residential neighborhood" and its presence must "not appreciably alter the characteristics of the neighborhood."  *Id.* § 155.310(a).  Consistent with this mandate, 2328 S. Noble Ave. is a ranch-style, three-bedroom home that does not appear outwardly different from other homes on the block.  2328 S. Noble Ave. Conditional Permitted Use Pet. (ECF No. 8-3) at 50–52, attached as Ex. 6; Dec. 20, 2016 City Council Mtg. Tr. (ECF No. 8-4) 16:19–24, attached as Ex. 7; Report of U.S. Expert Susan M. Connor at 12–13, attached as Ex. 8.  The home has created no traffic or parking issues for the City.  City Engineer Report, attached as Ex. 9; McLaughlin Dep. as Rule 30(b)(6) Designee for City vol. I ("McLaughlin 30(b)(6) Dep. I") 287:22–288:22, attached as Ex. 10.  It also has not been the subject of any police or emergency calls, other than a domestic disturbance call in 2014 that was unrelated to and did not involve the residents.  Ex. 5, Am. Answer at 32 ¶ 17.

4.      Since the spring of 2014, 2328 S. Noble Ave. has been the home of J.D., a 35-year-old man with intellectual and physical disabilities, and J.M., a 36-year-old man with intellectual disabilities.  Iocca Dep. 7:21–8:6, 10:3–10, attached as Ex. 11; McCombs Dep. 7:19–8:7, attached as Ex. 12; *see* Ex. 3 ¶ 13.  Another adult man with intellectual and physical

disabilities, A.D., lived with J.D. and J.M. at 2328 S. Noble Ave. until his death in September

2017.  Ex. 6 at 50–51; Suggestion of Death (ECF No. 30), attached as Ex. 13.

5.      The residents of 2328 S. Noble require 24-hour assistance with the activities of

daily living, including bathing, dressing, and eating, and they receive those services in the home

from the staff of IAG.  Ex. 3, Bennett Decl. ¶ 13; Valencia Decl. ¶ 7 (ECF 8-2), attached as Ex.

14.  In addition, during the day, J.D. and J.M. attend an IAG-run program with supported

employment services.  *Id.*; Ex. 12, McCombs Dep. 18:6–19:10.  A.D. was medically fragile prior

to his death and received day support services from IAG at home.  Ex. 3, Bennett Decl. ¶ 13.

Typically, two staff persons are present when the three residents are at home and awake, and one

staff person is home at other times.  Ex. 14, Valencia Decl. ¶ 7.

6.      Through their guardians, the residents of 2328 S. Noble lease the home directly

from the landlords, Christine and Robyn Hovey.  Lease at PLF0001, PLF0008, attached as Ex.

15.  With the families' consent, IAG handles rental payments and other administrative functions

related to the tenancy.[3]  *Id.* at PLF0009.

7.      The first tenant to sign the lease for 2328 S. Noble was A.D., through his sister

and guardian Mary Valencia.  *Id.* at PLF0008.  A.D. lived alone at the home for approximately

six weeks before J.D. and J.M. moved in.  Valencia Dep. 28:10–12, attached as Ex. 16.  At the

time Ms. Valencia signed the lease on behalf of A.D., both she and IAG were unaware that an

---

[3] That the residents of a group home, or their families or guardians, own or lease the dwelling –
as opposed to the provider agency doing so – is consistent with federal law governing Medicaid-
funded community residential services for persons with disabilities.  *See* 42 C.F.R.
§ 441.301(c)(4)(vi)(A) (residential services should be provided in a "unit or dwelling . . . that can
be owned, rented, or occupied under a legally enforceable agreement by the individual receiving
services").

agency called Sparc operated another CILA on the same block of Noble Ave. *Id.* 41:16–42:1; Ex. 4, Bennett 30(b)(6) Dep. 94:17–24.

8.      J.D. primarily uses a wheelchair to ambulate, Ex. 11, Iocca Dep. 7:22–23, as did A.D., Ex. 14, Valencia Decl. ¶ 5.  2328 S. Noble Ave. is fully accessible to persons with disabilities.  Ex. 3, Bennett Decl. ¶ 12.  The Hoveys modified the home at their own expense to make it more physically accessible by, for example, installing lowered kitchen countertops, accessible door thresholds, a roll-in shower, and accessible sliding doors opening onto the back patio.  *Id.*; Email from C. Hovey to Counsel for U.S. (April 2, 2017) (listing modifications), attached as Ex. 17.

9.      The guardians of J.D. and A.D., as well as IAG, found it difficult to locate physically accessible housing in the City and spent months looking for a suitable location for the residents.  Ex. 16, Valencia Dep. 35:6–36:5; Planning & Zoning Comm'n Hr'g Mins. at 10, attached as Ex. 18; Ex. 3, Bennett Decl. ¶ 25.

10.     This difficulty is consistent with the City's own statements that there is a "drastic shortage" of housing for persons with disabilities in Springfield.  2012 Analysis of Impediments to Fair Housing Choice ("AIFH") at 3, attached as Ex. 19.  Because the City receives funds under the federal Community Development Block Grant program, it is required to identify impediments to fair housing within the City, including unmet demands for particular kinds of housing.  *See, e.g.*, *id.* at 4.  In its periodic submissions to the U.S. Department of Housing and Urban Development ("HUD"), the City has acknowledged an unmet demand for housing that is accessible for people with disabilities.  2015–2019 City of Springfield HUD Consol. Plan (May 15, 2015) at 37, attached as Ex. 20 ("Advocacy groups for the physically disabled reported that it continues to be difficult to find accessible housing as the number of apartments, group homes

5

and single-family houses that are accessible and affordable in the City appear to be insufficient to meet the need."); Ex. 19 at 3 ("There is a drastic shortage of accessible rentals and single family residences available for people with disabilities."); 2006 AIFH at ch. 2 p. 3, attached as Ex. 21 (noting that Springfield's aging population will "impact demands on . . . disability assistance and mobility assistance" services designed "to avoid costly institutionalization as the population becomes more frail and grows disabled"); Jeffers Dep. as Rule 30(b)(6) Designee for City 75:4–7, attached as Ex. 22 ("Q. . . . [I]s the lack of available housing choices for persons with disabilities something that is addressed in each of your action plans?  A. Yes."), 86:23-87:8 ("Q. And so in 2012 [a shortage of accessible housing] was identified by the City as an impediment to Fair Housing?  A. Yes.  Q. Is this statement still accurate today?  A. . . .  [B]ased on the level of demand . . . for new emergency ramps and home modifications, I believe this to be true, yes.").

11.     Before moving to 2328 S. Noble, A.D. was institutionalized at the Murray Developmental Center, a large congregate living facility in Centralia, IL, more than two-and-a-half hours away from his family in Springfield.  Ex. 16, Valencia Dep. 11:16–12:6, 14:4–5; Ex. 4, Bennett 30(b)(6) Dep. 81:15–82:14.  After moving to 2328 S. Noble, A.D.'s developmental skills improved, and he gained the ability to feed himself using adaptive utensils and even to walk a few steps with assistance.  Ex. 16, Valencia Dep. 27:19–24.

12.     J.D. also moved from a large congregate facility, Brother James Court in Springfield, into 2328 S. Noble.  Ex. 11, Iocca Dep. 10:3–14.  Living in a physically accessible single-family home in the community has provided him with independence he lacked in the institution.  *Id.* 26:9–27:7.

13.     J.M. has lived in group homes or institutions since he was three years old.  Ex. 12, McCombs Dep. 32:2–13.  He loves living at 2328 S. Noble Ave.  *Id.* 37:7.

14.     In prior living situations, including the institutional settings, the 2328 S. Noble residents were required to share bedrooms with others and had little privacy or personal space, had their belongings stolen or broken, and experienced bullying and violence at the hands of other residents.  Ex. 11, Iocca Dep. 10:18–11:12; Ex. 12, McCombs Dep. 36:9–37:3; Ex. 14, Valencia Decl. ¶ 9.  By contrast, at 2328 S. Noble, the residents have their own private bedrooms and have not experienced any bullying or theft.  Ex. 11, Iocca Dep. 26:12–20; Ex. 12, McCombs Dep. 36:9–37:3; Ex. 14, Valencia Decl. ¶ 13.  In addition, the residents' family members live nearby in Springfield, and both J.D.'s and A.D.'s families are or were able to see them more often than when they were institutionalized.  Ex. 11, Iocca Dep. 29:13–20; Ex. 16, Valencia Dep. 38:15–22.

15.     The residents of 2328 S. Noble view themselves as a family and the house as their home.  Ex. 16, Valencia Dep. 36:23–38:11; Ex. 12, McCombs Dep. 37:4–14; Ex. 11, Iocca Dep. 28:13–20; Ex. 18 at 10.  J.M. and J.D. are close friends who have known each other since high school.  Ex. 11, Iocca Dep. 28:13–20.  They now run a small business together, selling snacks at their day program.  Ex. 12, McCombs Dep. 18:14–19:10.  J.M. and J.D. had great affection for A.D., whom they considered to be their "buddy."  Ex. 16, Valencia Dep. 37:22–38:6.  With support from IAG staff, the residents cook and eat dinner together, go grocery shopping, go out to restaurants, and attend dances, picnics, and outings.  *Id.* 37:6–21.

### B.  The City of Springfield's Zoning of Group Homes for Persons with Disabilities

16.     Springfield's zoning ordinance defines "family" as:  "One or more persons each related to one another by blood, marriage, or adoption, or is a group of not more than five

persons not all so related occupying a single dwelling unit[.]"  Springfield Zoning Code ("Code") § 155.001, attached as Ex. 23.  Families are permitted to live in residential zoning districts as a matter of right in Springfield.  Ex. 10, McLaughlin 30(b)(6) Dep. I 46:6–11.

17.      Unlike "family" residences, group homes like 2328 S. Noble Ave. are only permitted in residential neighborhoods if they comply with the City's 600-foot spacing rule for "community residences."  Ex. 23, Code § 155.053.

18.      A "community residence" is defined in part as a "single dwelling unit occupied on a relatively permanent basis in a family-like environment by a group of unrelated persons with disabilities, plus paid professional support staff provided by a sponsoring agency[.]"  *Id.* § 155.001.  This term includes group homes for persons with intellectual disabilities, as well as for the elderly, persons with physical disabilities, and persons with mental illness.  Ex. 5, Am. Answer at 28 ¶ 7.  It also includes CILAs and group homes of all sizes, including "family care residences," which are "community residences" for up to six persons, excluding support staff. Ex. 23, Code § 155.053; Ex. 5, Am. Answer at 28 ¶ 7.

19.      Since 1990, Springfield's zoning ordinance has restricted the locations of "community residences" through its spacing rule, which provides that a "community residence" may not be located within 600 feet of another "community residence" in a residential zoning district unless the home obtains a Conditional Permitted Use ("CPU") permit.  Ex. 5, Am. Answer at 28 ¶ 7.  According to Springfield's current Zoning Administrator, former Assistant Zoning Administrator, and Rule 30(b)(6) designee, Matthew McLaughlin, Springfield has never granted such a CPU permit.  Ex. 10, McLaughlin 30(b)(6) Dep. I 34:10–17, 283:11–15.

20.      The zoning ordinance states that the purpose of the 600-foot spacing rule is "to ensure that community residences, which operate most effectively in residential environments,

do not adversely affect those environments through over concentration or improper operation."
Ex. 23, Code § 155.053; *see also* Ex. 10, McLaughlin 30(b)(6) Dep. I 155:4–156:16 (testimony
by current Zoning Administrator as 30(b)(6) witness that purpose of spacing rule is to preserve
"the character of the neighborhood" and protect neighbors from "clustering" of group homes);
Ex. 7 at 23:11–12 (testimony by former Zoning Administrator that spacing rule was adopted to
alleviate "the adverse impact of traffic, congestion, shift changes").

21.     The City of Springfield does not maintain a list of "community residences" or
otherwise track their locations to ensure compliance with the 600-foot spacing rule or for any
other purpose.  Ex. 10, McLaughlin 30(b)(6) Dep. I 291:18–292:7.

22.     The 600-foot spacing rule for "community residences" applies solely to housing
for persons with disabilities, and not to housing for "families."  *Id.* 154:19-155:3.

23.     As confirmed by the City's 30(b)(6) representative, Matthew McLaughlin,
Springfield's zoning definition of "family" includes groups of up to five unrelated persons.  *Id.*
310:14–311:3.  Furthermore, the City has consistently interpreted and applied the "family"
definition to include groups of up to five unrelated persons since at least the early 1990s.  *E.g.*,
*id.* 311:4–312:8 (stating this has been the City's understanding of "family" since Mr.
McLaughlin became Assistant Zoning Administrator in 2008); 215 W. Elliott Emails (Oct.
2017), attached as Ex. 24 (zoning department emails regarding number of unrelated persons
living in home); 1058 N. 6th St. Zoning File (Feb. 2016), attached as Ex. 25 (zoning file
including letter from Assistant Zoning Administrator John Harris stating that "more than 5
unrelated persons living together" would violate the zoning code); 8th & Wood Emails (June
2014), attached as Ex. 26 (email from Zoning Administrator Matthew McLaughlin responding to
Alderman's inquiry about a home, stating, "If they have less than 6 people they are legal"); 1010

9

N. 5th St. Letter (Mar. 31, 2008), attached as Ex. 27 (letter from former Zoning Administrator stating that number of persons living in a single-family home must be reduced to 5 to abate zoning violation); 1235 N. 5th St. Letter (Mar. 1997), attached as Ex. 28 (letter from former Zoning Administrator stating up to five unrelated persons could live as a "family" in Oxford House recovery group home, but not more); 1235 N. 5th St. Letter (Oct. 1995) (ECF No. 8-3), attached as Ex. 29 (letter from Assistant Corporation Counsel stating five or fewer persons permitted to live as "family" in Oxford House home); 1991 Ill. Planning Council on Developmental Disabilities Report at 40 (ECF No. 15-2), attached as Ex. 30 (reflecting that up to five unrelated persons could live as a "family" in Springfield).

24.     Notwithstanding this history, the City contended in this litigation that "five unrelated persons cannot be considered a family" for zoning purposes, and therefore "could not legally occupy a single family home."  Resp. to Prelim. Inj. Mot. at 7 (ECF No. 15), attached as Ex. 31; Appellate Opening Br. at 12, attached as Ex. 32; *see also* Appellate Reply Br. at 1, attached as Ex. 33 ("[O]ur ordinance does not allow five unrelated persons to live together as a 'Family.'") (emphasis in original).  The City further claimed that "the phrase 'not more than five persons not all so related' in the definition [of "family"] is meant as a safe harbor allowing a traditional family to take in a [sic] unrelated boarder without losing the right to occupy a single family home (subject to a maximum of five total persons)."  Ex. 31 at 7; Ex. 32 at 12.  This Court specifically rejected that interpretation, Prelim. Inj. Op. at 4 n.2 (ECF No. 21), attached as Ex. 2, and after losing on appeal, *Valencia v. City of Springfield*, 883 F.3d 959, 971 (7th Cir. 2018), the City abandoned it, Answer to Pls.' Am. Compl. ¶ 1 n.1 (ECF No. 58), attached as Ex. 34.

25.     As Springfield now concedes, there was no factual basis for the argument that the provision for unrelated persons in its definition of "family" was intended to provide a "safe harbor" to "traditional famil[ies]" wishing to take in "an unrelated boarder."  Supp. Answers to U.S. 2d Interrogs. Nos. 13c–e, attached as Ex. 35 (responding to U.S. Interrogatories asking the City to identify the "factual basis" for its assertions about the definition of "family" and its purpose by stating that this position was "a legal opinion of the Corporation Counsel for the City").  Prior to this litigation, Springfield had never before construed or enforced the definition of "family" to require that at least two persons be related.[4]  McLaughlin Dep. as Rule 30(b)(6) Designee for City vol. II 211:7–18, attached as Ex. 36.

26.     Thus, contrary to its prior contentions, Springfield permits five unrelated persons without disabilities to reside together as a "family" anywhere in a single-family residential zoning district as a matter of right, Ex. 10, McLaughlin 30(b)(6) Dep. I 46:6–11, while requiring five unrelated persons with disabilities living in a "community residence" to obtain a special permit to live in a single-family zoning district if another "community residence" is located within 600 feet, Ex. 23, Code § 155.053.

**C. Springfield's Enforcement of the 600-Foot Spacing Rule**

27.     Springfield has known since at least September 2014 that 2328 S. Noble was operating as a group home on the same block as a Sparc group home.  Ex. 10, McLaughlin 30(b)(6) Dep. I 323:19–324:16.  In September 2014, the City's zoning department received an anonymous complaint about 2328 S. Noble, which was recorded by the City's Assistant Zoning Administrator, John Harris, as follows:  "Group Home?  Uncertain # of people there 4+? / plus a

---

[4] Mr. McLaughlin also testified that he was not aware that City had ever taken this position about the definition of "family."  McLaughlin 30(b)(6) Dep. vol. I 311:21–312:8.

Sparc Home is at 2317 Noble." Zoning Complaint Record at Valencia-00023, attached as Ex. 37; Harris Dep. 182:2–21, attached as Ex. 38. Zoning department staff preliminarily investigated the complaint by pulling property tax records for the two homes and noting the number of people living at 2328 S. Noble, Ex. 10, McLaughlin 30(b)(6) Dep. I 268:14–23; Ex. 37 at Valencia 00023-25, but took no further action to address it at that time, Ex. 10, McLaughlin 30(b)(6) Dep. I 269:23–271:6.

28.      In the spring of 2016, the City initiated a zoning enforcement action based on the 600-foot spacing rule against a different small group home operated by IAG at 137 Pinehurst Drive. 137 Pinehurst Zoning File at Valencia-00164, 00206–21, attached as Ex. 39.[5] The landlords of that house submitted a petition for a CPU permit and a request for a reasonable accommodation so that the group home could remain open. *Id.* at Valencia-00209–10; 137 Pinehurst Request, attached as Ex. 40. In August 2016, the City denied the 137 Pinehurst CPU permit request and ignored the reasonable accommodation request. Ex. 10, McLaughlin 30(b)(6) Dep. I 240:3–8, 261:8–21. The home closed shortly thereafter. Ex. 4, Bennett 30(b)(6) Dep. 58:21–22.

29.      In August 2016, days before the City denied the 137 Pinehurst CPU petition, the City also initiated a zoning enforcement action based on the 600-foot spacing rule against 2328 S. Noble Ave. Ex. 5, Am. Answer at 32–33 ¶ 20; Letter from John Harris, Assistant Zoning Administrator, to Christine & Robyn Hovey (Aug. 10, 2016), attached as Ex. 41.

30.      On October 17, 2016, in response to this enforcement action, the Hoveys and IAG applied for a CPU permit. Ex. 6; Ex. 5, Am. Answer at 33 ¶ 21. They also requested a reasonable accommodation to allow the three residents to remain in their home notwithstanding

---

[5] The City produced certain documents to the United States labeled with a "Valencia" prefix.

the 600-foot spacing rule, based on the residents' disabilities and need for housing in the

community.  Ex. 6 at 2 ¶ 7; Ex. 5, Am. Answer at 33 ¶ 21.  They attached documentation in

support of these requests, including information about IAG, the most recent national

accreditation report on IAG, photographs of the home, and an expert's summary of studies

showing that small group homes like 2328 S. Noble do not have an adverse impact on residential

neighborhoods.  Ex. 6; Ex. 5, Am. Answer at 33 ¶ 21.

i.      The Staff Recommendation

31.     About one month later, the Springfield Planning and Zoning Commission

received a recommendation from its professional staff to deny the CPU petition.  Staff Findings

& Rec. at 1–2, attached as Ex. 42; Ex. 5, Am. Answer at 33 ¶ 22.  The staff report concluded that

"[t]he evidence provided in the petition does not provide sufficient detail to allow staff to make a

reasonable determination whether the design and method of operation of the proposed use will

minimize the adverse effects on the character of the surrounding area[.]"  Ex. 42 at 1; Ex. 5, Am.

Answer at 33 ¶ 22.  The report did not explain what "adverse effects" the home was creating.

Ex. 42.  The report also did not identify or request any additional information that would have

allowed the Commission to determine how these effects could be minimized.  *Id.*

32.     The professional staff declined to address the request for a reasonable

accommodation, stating that they were "unable at this time to provide an expert opinion on . . .

this part of the request[.]"  *Id.* at 2.

ii.     The Springfield Planning and Zoning Commission Hearing

33.     The City's Planning and Zoning Commission scheduled a hearing on the 2328 S.

Noble Ave. CPU permit application for November 16, 2016.  Ex. 5, Am. Answer at 34 ¶ 23.

Prior to that hearing, the City erected a sign on the front lawn of the home to notify the neighbors

13

about the pending zoning case. *Id.* One of the residents, J.D., told his mother that the sign made him feel "really angry and upset and embarrassed" and "like he didn't belong, like people didn't want him" in his community. Ex. 11, Iocca Dep. 35:13–36:22. In addition, the staff of 2328 S. Noble told Ms. Valencia that, after the sign was posted, they had stopped taking A.D. on daytime walks and were keeping the blinds closed because they were intimidated by the neighbors. Ex. 16, Valencia Dep. 30:21–32:24.

34.     Early in the November 16, 2016 Planning and Zoning Commission hearing, before most of the testimony and evidence had been presented, Assistant Corporation Counsel Linda O'Brien provided legal advice to the Commissioners about Springfield's definition of "family." Ex. 18 at 6. Consistent with Springfield's longstanding enforcement practices, Ms. O'Brien explained that three unrelated persons could lease a home together as a "family." *Id.* at 7. She further opined that the three residents of 2328 S. Noble did not qualify as a "family" because their residence was a "group home," and therefore the 600-foot spacing rule applied to them. *Id.*

35.     The 2328 S. Noble Ave. petitioners presented evidence about the home and its minimal impact on the surrounding neighborhood, including testimony that there was no interaction between the home and the nearby Sparc CILA, that the landlords had made extensive modifications to the home to make it physically accessible, and that the residents' quality of life had improved in the family-like atmosphere of the home. Ex. 18 at 3–11; Ex. 34 ¶¶ 31(a)–(d). The Executive Director of IAG testified that if 2328 S. Noble were forced to close, the residents "would lose their home," and that "[t]here was absolutely nowhere else where [IAG] would be able to accommodate them. . . . It would be tragic. It would be devastating." Ex. 18 at 6.

36.     The petitioners also presented an expert witness who opined that: (1) 2328 S. Noble Ave. should not be subject to the 600-foot spacing rule because the three unrelated persons living there qualified as a "family" under the zoning code; and (2) even if the 600-foot spacing rule did apply, the home was entitled to a CPU permit.  Ex. 18 at 11–15; Ex. 34 ¶ 31(e).

37.     Lorraine Iocca, the mother and guardian of J.D., testified that her son had previously lived in a large institution where he shared a room with three other men, routinely had his belongings stolen, and was physically assaulted by other residents.  Ex. 18 at 10; Ex. 34 ¶ 31(d).  She stated that it had taken several months to find a new home for him, and that he was very happy at 2328 S. Noble.  Ex. 18 at 10.  She explained that he loved his fellow housemates and the IAG staff, that the house was perfectly suited to accommodate his disabilities, and that he considered 2328 S. Noble to be his home.  *Id.* at 10–11.

38.     At the conclusion of the hearing, the Planning and Zoning Commission voted 4–3 to adopt the staff recommendation to deny the CPU permit.  Ex. 18 at 20; Ex. 34 ¶ 35.  The Commission did not address or discuss the reasonable accommodation request.  Ex. 10, McLaughlin 30(b)(6) Dep. I 305:4–306:7.

39.     In voting to deny the CPU request, one Commissioner referenced the Commission's earlier vote to deny a CPU to the 137 Pinehurst home and expressed the concern that granting the 2328 S. Noble petition would set a bad "precedent."  Ex. 18 at 20.

### iii.     The City Council Hearing

40.     On December 20, 2016, the City Council held a hearing on the 2328 S. Noble CPU application.  Ex. 34 ¶ 37.  The petitioners reiterated their request that the CPU be granted, and, in the alternative, that the City grant a reasonable accommodation to allow the residents to remain in their home.  Ex. 7 at 7:11–15.

41.     William McCombs, the father and guardian of J.M., testified at the hearing and urged the Council to recognize that denying the CPU permit would amount to discrimination on the basis of disability.  *Id.* 16:11–20:1.  He noted that 2328 S. Noble was indistinguishable from the other homes on the block, *id.* 16:19–24, and that the group home had been open for nearly three years without incident, *id.* 17:15–16.  He asked the City to make an exception to the 600-foot spacing rule and not to deprive the residents of their housing simply "because they're different."  *Id.* 21:9–10.

42.     The Chief of Police told the City Council that, to his knowledge, there had been no police calls or disturbances at 2328 S. Noble.  *Id.* 26:6–17.  An Alderman also acknowledged that there had been "no issues" with the home in the years it had been operating.  *Id.* 21:1–2.

43.     The City Council voted 8–2 to adopt the Planning and Zoning Commission's recommendation and deny the CPU permit.  Ex. 34 ¶ 37.  The City Council did not address or discuss the request for a reasonable accommodation.  Ex. 10, McLaughlin 30(b)(6) Dep. I 304:24–305:8.  The request was never considered by the City Council, or by the City at any time. *Id.* 304:24–306:7.

44.     In advocating for the denial, one Alderman repeated the concern about setting a bad "precedent," Ex. 7 at 13:21–25, and another Alderman stated that he did not "think it's fair that we would decline one and allow the other," *id.* 24:11–15, referring to the denial of the 137 Pinehurst CPU request.  The Mayor also warned that granting the CPU permit would set a "precedence."  *Id.* 27:15–21.

45.     Springfield has never granted a CPU permit or a reasonable accommodation request to relieve a group home from the 600-foot spacing requirement.  Ex. 10, McLaughlin 30(b)(6) Dep. I 283:11–15.  The City has no process or policy for handling reasonable

16

accommodation requests in zoning and land-use matters.  *Id.* 312:10–318:10; Dep. of Juan

Huerta as Rule 30(b)(6) Designee for City 87:10–22, 94:7–16, 118:1–21, attached as Ex. 43

(Testimony of Director of Office of Community Relations).

46.     If Springfield had considered the three residents of 2328 S. Noble to be a

"family," the home would have been permitted as of right and not subject to the City's 600-foot

spacing rule.  O'Brien Dep. 245:2–10, 248:12–24, attached as Ex. 44; Ex. 8 at 3, 7; *see* Ex. 10,

McLaughlin 30(b)(6) Dep. I 46:6–11.

**D. Subsequent Proceedings and Springfield's Admissions**

47.     The private plaintiffs in this litigation filed suit on December 22, 2016, two days

after the City Council voted to deny the 2328 S. Noble CPU petition.  Pls.' Compl. (ECF No. 1).

48.     On January 11, 2017, the private plaintiffs moved for a preliminary injunction that

would prevent the City from evicting the residents of 2328 S. Noble during the pendency of this

litigation.  Prelim. Inj. Mot. (ECF No. 7).  At oral argument on the motion, counsel for the City

conceded that the 2328 S. Noble group home "doesn't harm the neighborhood" in which it is

located.  Prelim. Inj. Hr'g Tr. 39:18, attached as Ex. 45.  The Court granted the preliminary

injunction on August 2, 2017, Prelim. Inj. Op., Ex. 2 at 18, and a Seventh Circuit panel affirmed

the Court's decision on March 1, 2018, 883 F.3d at 971.

49.     After the Seventh Circuit denied its appeal, the City sought leave to file new

answers to the private plaintiffs' and United States' complaints, in order to "simplify the

proceedings in this case by not contesting liability for violation of the Fair Housing Act."  Mot.

to Am. Answers ¶ 6 (ECF No. 53), attached as Ex. 46.  The City also acknowledged that it had

"consistently represented to this Court" that it would amend its ordinance if its appeal failed, and

stated that it was "considering" those amendments as of June 2018.  *Id.* ¶¶ 3–4.

50.     The Magistrate Judge granted the City leave to amend its answers, June 20, 2018

Text Order, and the City did so, Ex. 5, Am. Answer; Ex. 34.  The City admitted that its "zoning

ordinance applicable to group homes for disabled persons, as in effect on the filing dates of the

complaints, discriminated against the residents of the group home located at 2328 Noble Ave.,

Springfield, IL ('Noble Home'), on the basis of their disability in violation of federal law."  Ex.

5, Am. Answer at 27, 29, 31–37 ¶¶ 1, 8, 9, 13, 16, 22, 24, 26–30; Ex. 34 ¶¶ 1, 32, 36–37, 40–44,

49, 50, 52–53, 59–60, 62–63, 69, 72–73.  In the same paragraphs, the City also denied "any

specific intent to discriminate" or "to violate applicable federal laws . . . at the time the zoning

ordinance was enacted."  *E.g.*, Ex. 5, Am. Answer at 27 ¶ 1; Ex. 34 ¶ 1.

51.     In addition, the City specifically admitted that section 155.053 (the 600-foot

spacing rule for group homes for persons with disabilities) and section 155.211.1 (the

requirements to obtain an exception to the spacing rule) of its zoning code were discriminatory.

Ex. 34 ¶ 1 n.1; *see* Ex. 23.[6]

52.     More than a year after assuring the Court that it would amend its zoning

ordinance, Ex. 46 ¶¶ 3–4, the City has not done so, and the admittedly discriminatory provisions

remain in place.  Ex. 36 at 212:3–16.

### ARGUMENT

The United States is entitled to summary judgment as to Springfield's liability for

violating the Fair Housing Act, 42 U.S.C. §§ 3601–3631.  Summary judgment is appropriate if

"there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  Once a moving party shows the absence of a genuine

---

[6] Springfield also admitted that section 155.211.2 of its ordinance was discriminatory, Ex. 34 ¶ 1 n.1, but that provision is not material to this case because it relates to "rehabilitation homes," which are not subject to the 600-foot spacing rule, *see* Ex. 23, Code § 155.053.

issue of material fact, the non-moving party must come forward with specific evidence, not mere allegations or denials, which demonstrates the existence of a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986); *Gracia v. Volvo Europa Truck, N.V.*, 112 F.3d 291, 294 (7th Cir. 1997). A party moving for summary judgment "can prevail just by showing that the other party has no evidence on an issue on which that party has the burden of proof." *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1183 (7th Cir. 1993); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (a mere "scintilla" of evidence in support of the non-movant's position is not sufficient to avoid summary judgment). "Undeveloped and unsupported arguments are waived." *Perez v. Leiter*, No. 1:16-cv-01116-JES-JEH, 2018 WL 2244711, at *4 (C.D. Ill. May 16, 2018) (citing *Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1002 n.1 (7th Cir. 2001)).

Here, the City has admitted that it "discriminated against the residents of the group home located at 2328 Noble Avenue . . . on the basis of their disability in violation of federal law" through its zoning ordinance. Undisputed Material Facts ("UMF") ¶ 50. As explained below, this admission and the factual record make clear that, by maintaining and enforcing a discriminatory zoning code, and refusing to grant a CPU permit or reasonable accommodation to allow the residents of 2328 S. Noble to remain in their home, the City has: discriminated in the sale or rental of dwellings, or otherwise made dwellings unavailable, to persons because of disability, in violation of 42 U.S.C. § 3604(f)(1); discriminated against persons in the terms, conditions, or privileges, of a dwelling because of disability, in violation of 42 U.S.C. § 3604(f)(2); and refused to makes reasonable accommodations in rules, policies, practices, or services which may be necessary to afford persons with disabilities an equal opportunity to use and enjoy a dwelling, in violation of 42 U.S.C. § 3604(f)(3)(B). As a matter of law, this conduct

constitutes both a "pattern or practice" of resistance to the full enjoyment of the rights granted by

the FHA, and a denial of the rights of a group of persons raising an issue of general importance,

within the meaning of 42 U.S.C. § 3614(a).  Accordingly, the Court should grant summary

judgment to the United States and against the City on liability.

### A.  Springfield Violated the Fair Housing Act by Maintaining and Enforcing its Facially Discriminatory Zoning Ordinance

On August 2, 2017, this Court held that the plaintiffs were likely to succeed on their

claim that Springfield's 600-foot spacing rule for group homes for persons with disabilities was

intentionally discriminatory in violation of the FHA.[7]  Prelim. Inj. Op., Ex. 2 at 13.  Two years

later, the undisputed factual record supports the Court's analysis, and so the United States is

entitled to summary judgment on its claims under 42 U.S.C. §§ 3604(f)(1)(B) and (f)(2).

The FHA makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make

unavailable or deny, a dwelling to any buyer or renter because of a handicap of . . . a person

residing in or intending to reside in that dwelling . . . ."  42 U.S.C. § 3604(f)(1)(B).  The Act also

prohibits discrimination against such individuals in the "terms, conditions, or privileges of sale

or rental of a dwelling, or in the provision of services or facilities in connection with such

dwelling."  *Id.* § 3604(f)(2).  As the Seventh Circuit has recognized, "Congress explicitly

intended for the [FHA] to apply to zoning ordinances and other laws that would restrict the

placement of group homes" for persons with disabilities.  *Oconomowoc Residential Programs,*

*Inc. v. City of Milwaukee*, 300 F.3d 775, 782 (7th Cir. 2002); *see Wis. Cmty. Servs., Inc. v. City*

*of Milwaukee*, 465 F.3d 737, 748 n.4 (7th Cir. 2006) (en banc) ("The [FHA] is intended to

---

[7] That claim is identical to the United States' claims under 42 U.S.C. §§ 3604(f)(1)(B) and (f)(2).
*See* U.S. Compl. ¶ 27(a)–(b) (No. 3:17-cv-03278, ECF No. 1).

prohibit the application of special requirements through land-use regulations, restrictive

covenants, and conditional or special use permits that have the effect of limiting the ability of . . .

individuals [with disabilities] to live in the residence of their choice in the community.")

(quoting H.R. Rep. No. 100-711, at 24 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2185).

      Statutes and ordinances are "facially discriminatory" under the FHA if, on their face, they

treat group homes for individuals with disabilities less favorably than similarly-situated group

living arrangements for non-disabled people.  *See Larkin v. Mich. Dep't of Social Servs.*, 89 F.3d

285, 290 (6th Cir. 1996).  Furthermore, when a zoning ordinance expressly "single[s] out"

individuals with disabilities and applies "different rules to them," its "discriminatory intent and

purpose" are "apparent on [its] face."  *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1500 (10th

Cir. 1995).  Thus, maintaining a facially discriminatory ordinance is a form of intentional

discrimination under the FHA; it is not necessary to "prove the malice or discriminatory animus

of a defendant" to establish intentional discrimination "where the defendant expressly treats

someone protected by the [FHA] in a different manner than others."  *Id.* at 1500–01.

Discriminatory statutes or ordinances "cannot survive unless they are warranted by the unique

and specific needs and abilities of those handicapped persons to whom they apply."  *United*

*States v. City of Chicago Heights*, 161 F. Supp. 2d 819, 843 (N.D. Ill. 2001); *accord* Prelim. Inj.

Op., Ex. 2 at 12 (adopting this reasoning).

      As explained above, in 2016, the City initiated an enforcement action against 2328 S.

Noble Ave. based on the spacing requirement.  *See* UMF ¶¶ 29–44.  Even though the three

unrelated residents of the home met the zoning code's definition of "family," *see* UMF ¶¶ 4, 16,

23–26, 36, the City took the position that the home could not remain open because it did not

meet the additional requirement – not applicable to other homes for up to five unrelated persons

without disabilities – that it comply with the 600-foot spacing rule.  *See* UMF ¶¶ 16–20, 22, 29, 38, 43, 46.

The City's enforcement action against 2328 S. Noble demonstrates that the spacing rule treats group homes for up to five unrelated persons with disabilities "less favorably than similarly-situated group living arrangements for" up to five unrelated "non-disabled people," making it facially discriminatory in violation of the FHA.  *See Larkin*, 89 F.3d at 290.  The ordinance also expressly "single[s] out" housing for persons with disabilities for differential treatment, making its "discriminatory intent and purpose . . . apparent on its face" and meeting the definition of intentional discrimination.  *See Bangerter*, 46 F.3d at 1500; *see also Chicago Heights*, 161 F. Supp. 2d at 843 ("Statutes that single out for regulation group homes for the handicapped are facially discriminatory.").  By maintaining the discriminatory spacing rule and enforcing it against the 2328 S. Noble group home, Springfield has denied housing and made it unavailable on the basis of disability, in violation of 42 U.S.C. § 3604(f)(1)(B): by definition, the spacing rule makes certain housing "unavailable" to persons with disabilities that would otherwise be available, *see* Ex. 23, Code § 155.053; and the City's denial of a CPU permit to allow 2328 S. Noble to remain open denied housing to the residents.  *See Chicago Heights*, 161 F. Supp. 2d at 836 (noting that § 3604(f)(1) "speaks to the denial of the opportunity to live in particular dwellings").  And Springfield's imposition of a 600-foot spacing rule on group homes for persons with disabilities but not on comparable housing for persons without disabilities plainly imposes discriminatory "terms" and "conditions" on housing on the basis of disability, in violation of 42 U.S.C. § 3604(f)(2).

The City cannot credibly deny that the conduct established above violates these provisions.  First, the City has expressly admitted to the Court that its spacing rule discriminates

on the basis of disability.  UMF ¶ 50.  Second, the undisputed facts here show that the spacing rule was adopted not to meet "the specific needs and abilities" of persons with disabilities, *see Chicago Heights*, 161 F. Supp. 2d at 843; Prelim. Inj. Op., Ex. 2 at 12, but rather to mitigate the "adverse impact" of group homes on residential neighborhoods, UMF ¶ 20.

Furthermore, the City's denial of any "specific intent" to discriminate does not absolve it of liability.  *See* UMF ¶ 50.  It is undisputed that the City imposed different rules on 2328 S. Noble than would have applied to a similarly situated home for five unrelated persons without disabilities, and that it did so precisely because the home housed "a group of unrelated persons with disabilities."  *See* Ex. 23, Code § 155.001 (defining "community residence" as housing occupied by "a group of unrelated persons with disabilities"); UMF ¶¶ 16–46.  And the City's boilerplate denial notwithstanding, subjecting persons with disabilities to more burdensome requirements than similarly situated persons without disabilities is intentional discrimination "because of" disability, even if it is allegedly undertaken for benign reasons or out of ignorance of legal requirements.  *See Int'l Union v. Johnson Controls, Inc.*, 499 U.S. 187, 188 (1991) ("[T]he absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect."); *Bangerter*, 46 F.3d at 1501 (holding it unnecessary to "prove the malice or discriminatory animus of a defendant" to establish intentional discrimination "where the defendant expressly treats someone protected by the [FHA] in a different manner than others").

Accordingly, the United States is entitled to summary judgment on its allegations that the City violated §§ 3604(f)(1) and (f)(2) of the Fair Housing Act.  *See* U.S. Compl. ¶ 27(a)–(b).

**B. Springfield Unlawfully Denied the 2328 S. Noble Ave. Request for a Reasonable Accommodation in Violation of the Fair Housing Act**

The undisputed facts also make clear that the City's conduct constituted a refusal to make a reasonable accommodation in violation of § 3604(f)(3)(B).[8]  *See* U.S. Compl. ¶ 27(c).  The FHA defines prohibited disability-based discrimination to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford" a person with a disability the "equal opportunity to use and enjoy a dwelling."  42 U.S.C. § 3604(f)(3)(B).  A municipality must, therefore, "reasonably accommodate a disabled person . . . as is necessary to provide that person with access to housing that is equal to that of those who are not disabled."  *Valencia v. City of Springfield*, 883 F.3d 959, 967 (7th Cir. 2018) (quoting *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 561 (7th Cir. 2003)).  The FHA "requires accommodation" if a request is "reasonable," and "necessary" to the equal housing opportunity of a person with a disability.  *Id.* at 967 (quoting *Oconomowoc*, 300 F.3d at 783).

Here, the City could have mitigated the effect of its facially discriminatory ordinance by granting an exception to the 600-foot spacing rule for 2328 S. Noble through a CPU permit or as a separate reasonable accommodation.  *See* UMF ¶ 30.  By refusing to do so, UMF ¶ 43, the City failed to grant a reasonable accommodation that was necessary for the 2328 S. Noble residents to have an opportunity to use and enjoy their home equal to that of persons without disabilities.

An accommodation is reasonable if it is "both efficacious and proportional to the costs to implement it." *Valencia*, 883 F.3d at 968 (quoting *Oconomowoc*, 300 F.3d at 784).  It is

---

[8] It is undisputed that the City received the 2328 S. Noble accommodation request and did not act upon it.  UMF ¶¶ 30, 43; *see also* Ex. 7 at 7:11–15; Ex. 10, McLaughlin 30(b)(6) Dep. I 304:24–306:7.

unreasonable if it "imposes undue financial or administrative burdens or requires a fundamental alteration in the nature of [a] program." *Id.* (quoting *Oconomowoc*, 300 F.3d at 784). The reasonableness of a particular accommodation request is a fact-specific question, but it can properly be answered at the summary judgment stage. *E.g.*, *Oconomowoc*, 300 F.3d at 787–88 (affirming grant of summary judgment for plaintiffs on reasonable accommodation claim in FHA case challenging spacing rule for group homes).

Here, the request for the three-person home at 2328 S. Noble Ave. to be granted an exception to the 600-foot spacing rule was indisputably reasonable. As this Court and the Court of Appeals reasoned, allowing 2328 S. Noble to remain open would "plainly effectuate" the goal of providing an integrated, community-based home for the residents, who have benefitted substantially from living there. *Valencia*, 883 F.3d at 970; *accord* Prelim. Inj. Op, Ex. 2 at 14; *see also* UMF ¶¶ 1–5, 85. For instance, at 2328 S. Noble, A.D. gained the ability to feed himself using adaptive utensils and to walk a few steps with assistance, which he could not do when he lived in a large institution. UMF ¶ 11. The residents all view each other as family and the house as their home, and they enjoy far greater privacy, security, and independence at 2328 S. Noble than they have in other settings. UMF ¶¶ 12–15. They share meals together, attend outings and special events, and spend time with their relatives. UMF ¶¶ 14–15.

At the same time, the undisputed evidence supports this Court's and the Court of Appeals' finding at the preliminary injunction stage that allowing 2328 S. Noble to remain open imposes no additional burdens on the City and does not "fundamentally alter" its zoning scheme. *See* Prelim. Inj. Op., Ex. 2 at 14; 883 F.3d at 970. In fact, there are a total of three residents in the home, a number that satisfies the City's definition of "family." UMF ¶¶ 4, 16, 23–26, 36; Ex. 8 at 7. At the time the City brought an enforcement action against the home, it had been

25

operating for more than two years with no incidents or problems, and with the City's knowledge. UMF ¶¶ 3–4, 27, 35, 42. It appears outwardly like any other home on the block and has not caused any increased traffic, police presence, or emergency services activity in the neighborhood. UMF ¶¶ 3, 25, 42; *see Valencia*, 883 F.3d at 970 ("[T]he City's own Traffic Engineer did not object to plaintiffs' CPU request."). Nor is there any evidence that 2328 S. Noble has any adverse impact on the nearby Sparc home. *See* UMF ¶ 35; *see also* Prelim. Inj. Op., Ex. 2 at 16 (dismissing concerns about effect of 2328 S. Noble on Sparc home as "entirely speculative"); *Valencia*, 883 F.3d at 970–71 (quoting Court's opinion for same and also observing that "it is not clear that greater interface between the residents of the Noble and Sparc homes would be problematic"). As a City Alderman acknowledged, there have been "no issues" with 2328 S. Noble Ave. since it opened in 2014. UMF ¶ 42; *see* Prelim. Inj. Op., Ex. 2 at 15 (noting same); *Valencia*, 883 F.3d at 970 (noting same). In the City's own words, the home "doesn't harm the neighborhood." UMF ¶ 48. The request is therefore reasonable.

Second, an accommodation is "necessary" if individuals with disabilities will "be denied the equal opportunity to live in a residential neighborhood" without it. *Valencia*, 883 F.3d at 968 (quoting *Oconomowoc*, 300 F.3d at 784). As the Seventh Circuit has explained, "[o]ften, a community-based residential facility provides the only means by which disabled persons can live in a residential neighborhood," and "[w]hen a zoning authority refuses to reasonably accommodate these small group living facilities, it denies disabled persons an equal opportunity to live in the community of their choice." *Id.* at 969 (quoting *Oconomowoc*, 300 F.3d at 784).

In this case, it is undisputed that it is necessary for the residents to receive in-home support services of the type offered at 2328 S. Noble in order to live in the community because of the nature and severity of their disabilities. UMF ¶¶ 4, 5, 8–9, 11–13. Furthermore, as this

Court previously recognized, "group homes are in short supply" in Springfield, as is physically accessible housing.  Prelim. Inj. Op., Ex. 2 at 14; *see* UMF ¶¶ 9–10, 37.  It took months to find a home in the City as appropriate to the residents' needs as 2328 S. Noble.  UMF ¶¶ 9, 37; *see* Prelim. Inj. Op., Ex. 2 at 14 (noting same); *Valencia*, 883 F.3d at 970 (noting same).  Thus, as long as the 600-foot spacing rule remains in place, an exception to the ordinance will be "necessary" to afford the three 2328 S. Noble residents the same "equal opportunity" to live in their neighborhood and home as a group of three unrelated persons without disabilities would have.  *See* 42 U.S.C. § 3604(f)(3)(B); *Wis. Cmty. Servs.*, 465 F.3d at 754 (stating accommodation is "necessary" when "the plaintiff shows that, 'but for' his disability, he would have been able to access the services or benefits desired"); *Oconomowoc*, 300 F.3d at 787 (holding variance to spacing rule "was necessary to provide [plaintiffs] with an equal opportunity to use and enjoy a dwelling" because their "range of residential living choices is restricted by their disabilities"); *Chicago Heights*, 161 F. Supp. 2d 841–42 (holding that a special use permit which would allow a group home to "locate in the dwelling of their choice" was a "necessary" accommodation); *see also Valencia*, 883 F.3d at 969 ("Practically speaking, therefore, plaintiffs seek the same opportunity as unrelated non-disabled individuals.").

Notably, the City's primary defense at the preliminary injunction stage to the allegation that it unlawfully failed to provide a reasonable accommodation – that the CPU permit application process, on its own, was a "reasonable accommodation" – was specifically rejected by the Seventh Circuit when it stated that a "zoning code and variance procedure [are] 'not in and of [themselves] an accommodation.'"  *Valencia*, 883 F.3d at 970 (quoting *Oconomowoc*, 300 F.3d at 785) (second alteration in original)).  In addition, the testimony of Springfield's 30(b)(6) representatives makes it clear that the City does not actually understand what a zoning-related

request for a reasonable accommodation is or how it should be handled by the City.  *See* UMF
¶ 45; *see also* Ex. 10, McLaughlin 30(b)(6) Dep. I 313:3–8 ("Q. . . . Do you have an
understanding . . . of the term, reasonable accommodation request?  Does that mean anything to
you?  A. No, not really.").

In sum, the undisputed facts show that the 2328 S. Noble accommodation request is
reasonable and necessary to the residents' equal housing opportunity.  The accommodation also
would impose no additional burdens or costs on the City, depriving it of any justification for its
refusal to accommodate the home.  And the factual allegations that both this Court and the Court
of Appeals relied on at the preliminary injunction stage to reach this same conclusion remain
undisputed now.  The Court should therefore find that Springfield was required to grant the
accommodation request under 42 U.S.C. § 3604(f)(3)(B), and that the United States is entitled to
summary judgment on its reasonable accommodation claim.  *See* U.S. Compl. ¶ 27(c).

### C.  Springfield Engaged in a Pattern or Practice of Discrimination and Denied Rights to a Group of Persons on the Basis of Disability in Violation of the FHA

The Fair Housing Act provides the United States with authority to bring suit "[w]henever
the Attorney General has reasonable cause to believe that any person or group of persons is
engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted
by" the FHA, "or that any group of persons has been denied any of the rights granted by" the
FHA "and such denial raises an issue of general public importance."  42 U.S.C. § 3614(a).  The
City's conduct satisfies both prongs of this provision.

The United States establishes a "pattern or practice" of discrimination in violation of the
FHA when the facts show that the discrimination in question is the defendant's "standard
operating procedure – the regular rather than the unusual practice."  *United States v. Balistrieri*,
981 F.2d 916, 929 (7th Cir. 1992); *accord United States v. Int'l Bhd. of Teamsters*, 431 U.S. 324,

336 (1977).  Proof of a discriminatory policy is sufficient to establish a pattern or practice; and

once that has been shown, the United States need not introduce specific instances of

discrimination to establish a claim under 42 U.S.C. § 3614(a).  *See Chicago Heights*, 161 F.

Supp. 2d at 842 ("The Attorney General may demonstrate the existence of a 'pattern or practice'

of discrimination by showing the existence of a discriminatory policy alone"); *see also, e.g.*,

*United States v. Garden Homes Mgmt. Corp.*, 156 F. Supp. 2d 413, 423 (D.N.J. 2001) ("Proof

that a party adopted a discriminatory policy satisfies the Fair Housing Act's pattern [or] practice

requirement."); *United States v. City of Parma*, 494 F. Supp. 1049, 1095 (N.D. Ohio 1980), *aff'd*

*as modified*, 661 F.2d 562 (6th Cir. 1981) ("The existence of a discriminatory policy, statute, or

ordinance is itself a discriminatory pattern or practice.").

　　　　Springfield admits that its zoning ordinance – a City policy or procedure – is

discriminatory in violation of the FHA.  UMF ¶¶ 50–51.  The existence of this admittedly

discriminatory policy is enough to establish that the City has engaged in a prohibited "pattern or

practice" of discrimination.  *See, e.g.*, *Chicago Heights*, 161 F. Supp. 2d at 842–43.  There is

additional evidence of Springfield's "pattern or practice" here, however, because on both of the

occasions that the City was asked to grant an exception to its spacing rule, it refused.  UMF

¶¶ 28, 38, 43, 45.  Moreover, the City decision-makers' concerns about setting a bad "precedent"

by granting the 2328 S. Noble CPU suggested that they intended to take the same action in future

spacing rule cases.  *See* UMF ¶¶ 39, 44.  Indeed, this case is virtually indistinguishable from

*Chicago Heights*, in which a court in the Northern District of Illinois found that a city had

engaged in a pattern or practice of discrimination in violation of the FHA by imposing a spacing

rule on group homes for up to five persons with disabilities while at the same time permitting up

to five persons without disabilities to live together as a "family," and refusing to grant a

reasonable accommodation to that home.  161 F. Supp. 2d at 833, 846.  For the same reasons, the City is liable for engaging in a "pattern or practice" of discrimination in this case.

Furthermore, by applying the spacing rule to 2328 S. Noble Ave. and refusing to make an exception as a reasonable accommodation for the three residents, the City also denied rights to a group of persons.  *See* 42 U.S.C. § 3614(a); *City of Parma*, 494 F. Supp. at 1095 (holding "denial of rights" claim established where United States "show[s] that the discriminatory conduct affects more than a single individual").  And the availability of community-based housing for persons with disabilities is unquestionably an "issue of general public importance."  *See, e.g.*, *Chicago Heights*, 161 F. Supp. 2d at 843 (holding that city's maintenance and application of discriminatory zoning provisions and denial of accommodation to group home for persons with disabilities supported both "pattern or practice" and "denial of rights" theories under § 3614(a)); *see also* Ex. 30 at 6 (Illinois Planning Council on Developmental Disabilities report noting importance of community-based housing for persons with disabilities to federal and state policy); Ill. Admin. Code tit. 59, pt. 115.100(b) (stating policy purpose of State of Illinois' CILA program is to "promote optimal independence in daily living and economic self-sufficiency of individuals with a mental disability").  The City is therefore also liable for denying fair housing rights to a group of persons, raising an issue of public importance.  *See* 42 U.S.C. § 3614(a).

Accordingly, the Court should enter summary judgment in favor of the United States on its § 3614(a) claims.  *See* U.S. Compl. ¶ 29.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court grant summary judgment to the United States as to the liability of the City of Springfield.  In addition, in light of the City's ongoing failure to amend its admittedly discriminatory zoning ordinance,

*see* UMF ¶¶ 50–52, the United States requests that the Court order the City to submit a plan to expeditiously remediate its violations of the Fair Housing Act.  Should the Court grant this motion, the United States intends to seek monetary damages for aggrieved persons, other appropriate injunctive relief, and a civil penalty, as authorized by the Fair Housing Act.  *See* 42 U.S.C. § 3614(d).

Dated: July 31, 2019

Respectfully submitted,

| | |
|---|---|
| JOHN C. MILHISER | ERIC S. DREIBAND |
| United States Attorney | Assistant Attorney General |
| Central District of Illinois | Civil Rights Division |

| | |
|---|---|
| s/Joshua I. Grant | s/Eliza H. Simon |
| JOSHUA I. GRANT | SAMEENA SHINA MAJEED |
| Assistant United States Attorney | Chief |
| United States Attorney's Office | TIMOTHY MORAN |
| Central District of Illinois | Deputy Chief |
| 318 S. Sixth Street | ELIZA H. SIMON |
| Springfield, IL 62701 | KINARA A. FLAGG |
| Tel: (217) 492-4450 | MAX LAPERTOSA |
| Fax: (217) 492-4512 | Trial Attorneys |
| Joshua.Grant@usdoj.gov | United States Department of Justice |
| | Housing and Civil Enforcement Section |
| | Civil Rights Division |
| | 950 Pennsylvania Ave. NW – 4CON |
| | Washington, DC 20530 |
| | Tel:  (202) 305-6785 |
| | Fax:  (202) 514-1116 |
| | Eliza.Simon@usdoj.gov |
| | Kinara.Flagg@usdoj.gov |
| | Max.Lapertosa@usdoj.gov |

Attorneys for Plaintiff United States of America

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 31, 2019, I caused to be served a copy of the foregoing

document entitled **United States' Motion for Partial Summary Judgment on Liability** via the

CM/ECF system to the following counsel of record:


Steven C. Rahn
Linda A. O'Brien
Office of Corporation Counsel
City of Springfield
800 E. Monroe St., Rm. 313
Springfield, IL 62701
Steven.Rahn@springfield.il.us
Linda.OBrien@springfield.il.us


Randall A. Mead
Drake Narup & Mead PC
107 E. Allen St.
Springfield, IL 62704
Mead@dnmpc.com


Thomas E. Kennedy, III
tkennedy@KennedyHuntLaw.com
Sarah Jane Hunt
sarahjane@KennedyHuntLaw.com
Kennedy Hunt, P.C.
906 Olive St., Suite 200
St. Louis, MO 63101


<u>s/Eliza H. Simon</u>
Trial Attorney