UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| MARY B. VALENCIA, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:16-cv-03331-SLD-JEH |
| | ) | |
| CITY OF SPRINGFIELD, ILLINOIS, | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:17-cv-03278-RM-TSH |
| | ) | |
| CITY OF SPRINGFIELD, ILLINOIS, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER

This is a Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601–3631, case regarding the City of

Springfield's ("City") zoning practices, arising out of zoning enforcement against 2328 Noble

Avenue ("Noble"), a residence in Springfield used as a group home for three adults with

disabilities. Am. Compl. ¶¶ 1, 8, ECF No. 33.[1] Mary B. Valencia as the independent

administrator of the estate of a former Noble resident, A.D.,[2] another individual resident, and

Individual Advocacy Group, Inc. ("IAG"), the not-for-profit corporation operating the group

---

[1] ECF references and other citations correspond to the docket of 3:16-cv-03331-SLD-JEH unless otherwise specified.
[2] The initial Noble residents, with their guardians denoted in parentheses, were A.D. (Mary B. Valencia), J.M. (William McCombs), and J.D. (Lorraine Iocca). Proposed Pretrial Order 4, ECF No. 166. During the pendency of this matter, A.D. passed away and a new resident, B.A., moved into Noble. *Valencia v. City of Springfield* (*Valencia III*), No. 16-3331, 2020 WL 1265421, at *3 (C.D. Ill. Mar. 16, 2020).

1

home (collectively "Private Plaintiffs"), sued the City for discriminating on the basis of disability, thereby violating federal law, including the FHA.[3] *E.g.*, *id.* ¶ 1. The United States of America ("USA") sued the City under the FHA for the same discriminatory course of conduct. Case No. 3:17-cv-03278, Compl. ¶ 1, ECF No. 1. The cases were consolidated. Mar. 1, 2018 Order, ECF No. 39.

Many motions remain pending in this long-running matter: the City's Motion for Leave to File a Remediation Plan, ECF No. 116;[4] the USA's Motion for an Award of Civil Penalties ("USA Motion Civil Penalties"), ECF No. 134; the USA's Motion for Leave to File Reply in Support of United States' Motion for an Award of Civil Penalties, ECF No. 162; Private Plaintiffs' Request for Delay of Entry of Judgment and Request for Additional Time to File Plaintiffs' Motion for Attorneys' Fees and Costs ("Private Plaintiffs' Request Delay Judgment"), ECF No. 189; Private Plaintiffs' Motion for Reasonable Attorneys' Fees and Litigation Expenses ("Plaintiffs' Motion Attorneys' Fees"), ECF No. 190; the City's Motion to Extend Deadline to Respond to Attorneys' Fees Motion, ECF No. 191; the USA and Private Plaintiffs' (collectively "Plaintiffs") Motion for Entry of Final Judgment on the Jury's Verdict, ECF No. 196; and Plaintiffs' Motion for Status Conference, ECF No. 197.

At a high level, Plaintiffs request the Court enter a civil penalty against the City, impose equitable relief against the City, clarify an attorneys' fees briefing schedule, and enter a final judgment on the jury's verdict alongside other ancillary relief. Pls.' Mot. Status Conference ¶ 7.

---

[3] Private Plaintiffs asserted claims under the FHA, the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12212, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Am. Compl. ¶ 1. The Court granted summary judgment as to liability for Private Plaintiffs on claims under all three statutes. *Valencia III*, 2020 WL 1265421, at *1, *9. Because the claims are sufficiently similar, the Court focuses its analysis on the FHA.

[4] The City was ordered to file a remediation plan by July 1, 2020. *Valencia v. City of Springfield* (*Valencia II*), 446 F. Supp. 3d 369, 385 (C.D. Ill. 2020); *see also* May 28, 2020 Text Order (extending deadline from June 1 to July 1, 2020). The City did not file its remediation plan until July 9, 2020, and styled its filing within CM/ECF as a motion for leave to file the plan. Mot. Leave File Remediation Plan. Leave to file is granted, and the Court considers the City's remediation plan.

For the reasons that follow, the Court enters a civil penalty of $61,982.50 against the City, enters injunctive relief prohibiting enforcement of the spacing rule, awards prejudgment interest on portions of the jury's verdict, sets a briefing schedule for attorneys' fees, and directs a final judgment be entered.

## BACKGROUND

Further factual background is available in the Court's previous orders. *See, e.g.*, *Valencia v. City of Springfield* (*Valencia III*), No. 16-3331, 2020 WL 1265421, at *1–4 (C.D. Ill. Mar. 16, 2020). The dispute centered on a zoning enforcement action initiated in 2016 by the City against Noble based on a spacing rule preventing two family care residences or group community residences from being located within 600 feet of each other. *Id.* at *2; *see also* Springfield, Ill., Code of Ordinances § 155.053 (2023) (imposing spacing rule for "family care residence[s] and group community residence[s]," unchanged from 2016). The City required Private Plaintiffs to seek a conditional permitted use ("CPU") permit because there was another group home nearby. *Valencia III*, 2020 WL 1265421, at *2. Conversely, the City's zoning code allowed families to live in any residential district. *See id.*; Springfield, Ill., Code of Ordinances § 155.001 (2023) (defining "family" as "[o]ne or more persons each related to one another by blood, marriage, or adoption, or is a group of not more than five persons not all so related occupying a single dwelling unit which is not a boardinghouse or lodging house as defined in this section," unchanged from 2016). The three non-related Noble residents fit this definition, which should have precluded the spacing rule's application. *Valencia III*, 2020 WL 1265421, at *2.

The City disagreed that the Noble residents constituted a family for zoning purposes and also denied Private Plaintiffs' CPU request. *Id.* at *1. Private Plaintiffs sought preliminary injunctive relief to prohibit enforcement of the spacing rule and eviction of the Noble residents

while this suit was pending. *A.D. ex rel Valencia v. City of Springfield*, No. 16-3331, 2017 WL 3288110, at *1 (C.D. Ill. Aug. 2, 2017), *aff'd sub nom. Valencia v. City of Springfield* (*Valencia I*), 883 F.3d 959 (7th Cir. 2018). The preliminary injunction was granted, *A.D. ex rel Valencia*, 2017 WL 3288110, at *7, and affirmed upon appeal, *Valencia I*, 883 F.3d at 971. Importantly, the City admitted its ordinance discriminated against the Noble residents after its unsuccessful appeal but denied any specific intent to discriminate. Def.'s Am. Answer ¶ 32, ECF No. 58.

Both the USA and Private Plaintiffs successfully moved for partial summary judgment on liability. *See Valencia v. City of Springfield* (*Valencia II*), 446 F. Supp. 3d 369, 385 (C.D. Ill. 2020) (USA); *Valencia III*, 2020 WL 1265421, at *9 (Private Plaintiffs). These orders—coupled with the City's admission of discrimination—established the at-issue ordinance was facially discriminatory. *See Valencia III*, at *4 ("[T]he City had not amended the facially discriminatory zoning ordinance."); *Valencia II*, 446 F. Supp. 3d at 380–81 (similar). On July 26, 2022, a jury awarded Private Plaintiffs $293,000 in compensatory damages. Verdict Form, ECF No. 184.

## DISCUSSION

## I.    USA's Motion for Leave to File a Reply

The FHA allows the USA to seek a civil penalty to "vindicate the public interest" in pattern or practice cases, with a fixed maximum amount. 42 U.S.C. § 3614(d)(1)(C). This statutory maximum is in turn adjusted for inflation. 28 C.F.R. § 85.5. Because this is the City's first FHA violation and the discriminatory conduct began in 2016, the maximum civil penalty is fixed at $123,965. *See id.* (table with inflation-adjusted figures). The USA seeks a penalty of $107,050, USA Mem. Civil Penalties 1, ECF No. 135, which was the statutory maximum when the USA filed its civil penalty motion and memorandum on September 4, 2020, 28 C.F.R. § 85.5. The City argues no civil penalty is warranted. City Resp. Civil Penalties 9, ECF No. 161.

Per Local Rule 7.1(B)(3), the USA seeks leave to reply. USA Mot. Leave File Reply Supp. of USA's Mot. Award Civil Penalties 1. The City does not oppose that request. Def.'s Resp. USA's Mot. File Reply ¶ 1, ECF No. 163. Local Rule 7.1(B)(3) requires a party to seek leave of Court to file a reply, which is typically given "if the party opposing a motion has introduced new and unexpected issues in his response to the motion, and the Court finds that a reply from the moving party would be helpful to its disposition of the motion . . . ." *United States v. Kellogg Brown & Root, Inc.*, No. 4:12-cv-04095-SLD-JEH, 2020 WL 13413224, at *2 (C.D. Ill. Mar. 30, 2020) (quotation marks omitted). The City's civil penalties response raised new evidence discussing an unexpected issue, City Resp. Civil Penalties 4–5, to which the Court finds the USA's reply is helpful, *see Kellogg Brown & Root*, 2020 WL 13413224, at *2. Leave to file the reply is therefore granted.

## II.    Civil Penalty

Courts consider the following factors when deciding whether to impose a civil penalty: "[(1)] the nature and circumstances of the violation, [(2)] the degree of culpability, [(3)] any history of past violations, [(4)] the financial circumstances of that Defendant and the goal of deterrence, and [(5)] other matters that justice may require." *Smith & Lee Assocs., Inc. v. City of Taylor* (*Smith & Lee I*), 13 F.3d 920, 932 (6th Cir. 1993) (quoting H.R. Rep. No. 100-711, at 40 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2201). Before analyzing those factors, the Court addresses the City's request for an evidentiary hearing on the civil penalty issue. *See* City Resp. Civil Penalties 1–2, 10.

The Court finds an evidentiary hearing is unnecessary to resolve the civil penalty issue. The City argues an evidentiary hearing is necessary because the USA's memorandum filed in support of its motion for a civil penalty is "replete with disputed factual conclusions," City's

Resp. Civil Penalties 2, and "material factual disputes prevent the determination and imposition of civil penalties" without first holding an evidentiary hearing, *id.* at 10. Specifically, the City argues the USA failed to: (1) causally link the City's shortage of accessible housing to the City's spacing rule, (2) show the City would have evicted the Noble residents but for the Court's preliminary injunction, (3) establish a discriminatory motive on the part of any City official, or (4) demonstrate a history of FHA violations or enforcement of the spacing rule. *Id.* at 7–8.

Determination of a civil penalty is entrusted to the Court, not a fact-finding jury. The Supreme Court has held that imposition of a civil penalty without first determining liability on legal claims violates the Seventh Amendment, but because "Congress itself may fix the civil penalties, it may delegate that determination to trial judges." *Tull v. United States*, 481 U.S. 412, 425–27 (1987). Here, liability was determined at summary judgment. *See, e.g.*, *Valencia II*, 446 F. Supp. 3d at 382 ("[T]he Court concludes that summary judgment in favor of the United States and against the City of Springfield is warranted as to liability."); *see also Fidelity & Deposit Co. v. United States*, 187 U.S. 315, 319–21 (1902) (holding that summary judgment does not violate the Seventh Amendment). Therefore, a jury trial or evidentiary hearing specifically related to civil penalties—after liability was established as a matter of law—is not a prerequisite to assessing a civil penalty. *See Walker v. Crawford*, Nos. 5:98 CV 1033, 5:98 CV 743, 5:98 CV 1487, 1999 WL 33921853, at *1 (N.D. Ohio Nov. 16, 1999) (concluding in an FHA case that "[i]t is a question for the Court, not the jury, to determine the propriety of imposition of a statutory penalty, and the amount" (citing *Tull*, 481 U.S. at 426–27)); *see also United States v. Villegas*, 373 F. Supp. 2d 1228, 1228 (D.N.M. 2004) (vacating previously set evidentiary hearing on FHA civil penalty issue because the court "determined that an evidentiary hearing would not

6

assist the Court in its decision").  The extensive record already compiled in this matter is more

than sufficient to resolve the factual disputes identified by the City—no hearing is necessary.

Given the Court's prior liability findings and the analysis below, the Court finds a civil

penalty is warranted.  The *Smith & Lee I* factors are analyzed in order to determine the amount of

the penalty.  *See* 13 F.3d at 932 (enumerating the factors); *see also* H.R. Rep. No. 100-711, at 40

(1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2201 (indicating these factors should be

considered "[w]hen determining the *amount* of a penalty" (emphasis added)).

### A.  Nature and Circumstances of the Violation

The Court finds that the nature and circumstances of the violation are an aggravating

factor.  In support of imposing a maximum penalty, the USA sets out the broader legal and social

context for this FHA violation.  USA Mem. Civil Penalties 7–8.  The Supreme Court held in

*Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581, 587 (1999), that the Americans with Disabilities

Act requires community-based care instead of institutionalization, where such placements can be

reasonably accommodated and certain other conditions are met.  Illinois has tried to act in

accordance with the national trend—spurred by cases like *Olmstead*—to shift individuals from

institutions to community-based facilities.  *Ill. League of Advocs. for the Developmentally

Disabled v. Ill. Dep't of Human Servs.*, 803 F.3d 872, 874 (7th Cir. 2015).  A current consent

decree requires Illinois ensure the availability of "Community-Based Services" for a certain class

of persons with intellectual disabilities.  USA Mem. Civil Penalties 7–8 (citing Consent Decree,

*Ligas v. Hamos*, No. 05-cv-4331 (N.D. Ill. June 15, 2011), ECF No. 549).  The USA claims all

three Noble residents were at least indirect beneficiaries of *Olmstead* and *Ligas*, with one Noble

resident, J.D., being a direct beneficiary as a *Ligas* class member.  *Id.* at 8.

7

The USA argues the City's FHA violations impeded this trend and hindered the ability of persons with disabilities "to live in the community and avoid unnecessary institutionalization," thereby avoiding harmful stigmatization. *Id.* at 6; *see also Olmstead*, 527 U.S. at 600–01 (detailing the harms from such stigmatization, such as diminishing individuals' "family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment"). The USA cites the City's admitted "drastic shortage" of accessible housing, USA Mem. Civil Penalties 9 (quotation marks omitted), and the USA's expert's opinion that—against this trend—the City's spacing rule was not "defensible from a planning or zoning perspective," *id.* at 8 (quoting Connor Report 12, USA Mot. Partial Summ. J. Liability Ex. 8, ECF No. 91-8). The USA argues the City's failure to maintain a list of community residences made compliance with the spacing rule opaque and difficult, and when combined with the City's "standard operating procedure" of refusing to waive the spacing rule, the City unjustifiably hindered community placements. *Id.* at 9–10 (quoting *Valencia II*, 446 F. Supp. 3d at 382).

The City argues this factor counsels against a penalty because the spacing rule "was adopted to protect group homes from being segregated into a single neighborhood" and the City "took no action to remove the residents." City Resp. Civil Penalties 7. The City disputes that the spacing rule caused a shortage of accessible housing, *id.*, and notes the City had no occasion to enforce the spacing rule for more than 25 years, *id.* at 9. The City claims imposing civil penalties under the FHA against municipalities is rare and doing so "in contested cases is rarer still." *Id.* The City focuses on "insufficient proof of intentional discrimination." *Id.* (citing *Smith & Lee Assocs. Inc. v. City of Taylor* (*Smith & Lee II*), 102 F.3d 781 (6th Cir. 1996)).

The City's supposed good faith underlying the spacing requirement—avoiding clustering community residences into a single neighborhood—is not borne out by the record. *See Horizon*

*House Developmental Servs., Inc. v. Twp. of Upper Southampton*, 804 F. Supp. 683, 694–95 (E.D. Pa. 1992), *aff'd*, 995 F.2d 217 (3d Cir. 1993) (rejecting identical "clustering" rationale for a similar spacing rule for residences for persons with disabilities).  City officials were more concerned with "setting a precedent"—which would allow the unascertained number of existing group homes to continue operating—than with preventing clustering via a previously unused provision of its zoning code. *See Valencia II*, 446 F. Supp. 3d at 382 ("[C]ertain City decision-makers stated they were concerned about setting a bad 'precedent' if they granted the 2328 S. Noble CPU . . . .").

The Court is also unpersuaded that the City's decision to not take further action against the Noble residents—after this case began—matters in this analysis, when to do so would risk civil contempt for violating the preliminary injunction in this case. *Cf. A.D. ex rel Valencia*, 2017 WL 3288110, at *7 (enjoining the City from instituting eviction proceedings against the Noble residents while the instant matter remains pending).  The spacing rule need not be the root cause of the existing shortage of accessible housing—what matters is enforcement of this facially discriminatory zoning rule would exacerbate that shortage.  Finally, the lack of previous enforcement efforts is an aggravating factor—not mitigating—when considered alongside the City's conduct once it decided to begin enforcement. *See United States v. Borough of Audubon*, 797 F. Supp. 353, 360–61 (D.N.J. 1991), *aff'd*, 968 F.2d 14 (3d Cir. 1992) (finding that the "zealous enforcement of local zoning ordinances [which] would not necessarily connote discrimination if standing alone" did connote discrimination given the municipality's prior "history of a general lack of enforcement").

Instead, the Court finds the national and statewide trend of community placement to be the most relevant and aggravating circumstance.  The City's primary citation for emphasizing

discriminatory intent, *Smith & Lee II*, would not condone the City's actions at this point of the FHA's existence.  In vacating the civil penalty imposed by the district court, the Sixth Circuit found it would be "unfair" to make an example of the City of Taylor because "Taylor's City Council considered Smith & Lee's rezoning petition when the law was still largely unsettled." *Smith & Lee II*, 102 F.3d at 798.  The Sixth Circuit went on to warn that "[f]uture municipal defendants who choose not to heed the now more comprehensible dictates of the [Fair Housing Act Amendments] would make better candidates for a fine than Taylor does." *Id.*  Caselaw concerning disability discrimination has developed significantly since that 1996 warning, and subsequent developments within Illinois made clear that community-based housing for persons with disabilities is important in Illinois in particular. *Ill. League of Advocs.*, 803 F.3d at 874 ("Since 2012 Illinois has been trying to shift the residents of the [state-operated developmental centers] to community-based facilities, in accordance with a national trend—and a dramatic one, which has left Illinois a laggard outlier, with a higher number of [state-operated developmental center] residents than any states except New Jersey and Texas.").  Imposing a higher penalty would help continue this trend towards community-based residency by deterring future municipalities from using zoning provisions to discriminate based on disability.

### B.  Degree of Culpability

The Court finds the City's conduct sufficiently culpable, such that it is an aggravating factor.  Before examining the Parties' arguments, two points about "culpability" in this context merit clarification.  First, a showing of intentional discrimination is not a prerequisite for assessing a civil penalty.  *United States v. Pac. Nw. Elec., Inc.*, No. CV-01-019-S-BLW, 2003 WL 24573548, at *29–31 (D. Idaho Mar. 21, 2003).  The FHA allows courts "to vindicate the public interest, assess a civil penalty against the respondent."  42 U.S.C. § 3614(d)(1)(C).  Some

courts have found a civil penalty "is especially appropriate when a defendant is found to have intentionally discriminated against [persons with disabilities]." *Smith & Lee II*, 102 F.3d at 798. While intentional discrimination bolsters the case for a civil penalty, § 3614(d)(1)(C) itself makes no mention of intentionality, and other courts have found that plaintiffs "need not show intentional discrimination to assert a claim for civil penalties." *Pac. Nw. Elec.*, 2003 WL 24573548, at *31.

Second, "intentional" discrimination in the FHA context does not solely depend on a defendant's subjective beliefs, motive, or malice. Instead, "a plaintiff makes out a prima facie case of intentional discrimination under the FHA[Amendments] merely by showing that a protected group has been subjected to explicitly differential—i.e. discriminatory—treatment." *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501 (10th Cir. 1995). In the analogous Title VII context, the Supreme Court has held "the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect." *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991). Accordingly, the culpability factor is meant to capture not only subjective malice, but also other circumstances suggesting blameworthiness. *See, e.g.*, *Castillo Condo. Ass'n v. U.S. Dep't of Hous. & Urb. Dev.*, 821 F.3d 92, 96 & 100 n.7 (1st Cir. 2016) (affirming Secretary's reversal of an administrative law judge's award in a fair housing case, where the Secretary "counted the Association's ignorance of the law as an aggravating factor, not a mitigating factor, and upped the civil penalty to $16,000 (the maximum available penalty amount)").

Turning to the Parties' arguments, the City first argues it was not culpable because the spacing rule "was adopted in a good faith effort to comply with the requirements of the FHA,"

11

and its zoning experts' opinions from the 1990s praised the rule's compliance with the FHA. City Resp. Civil Penalties 8 (emphasis removed). For example, the City has consistently pointed to the 1990 declarations of Daniel Lauber—a consultant to the Illinois Planning Council on Developmental Disabilities—who advised home-rule cities like Springfield on their plans to comply with FHA amendments prohibiting discrimination based on disability. *See Valencia II*, 446 F. Supp. 3d at 372–73, 379 (describing Mr. Lauber's role, his advice to the City, and the City's arguments based on such advice). Back in 1990, Mr. Lauber was aware "there might be uncertainty or ambiguity about whether a group home with 5 or fewer residents should be subjected to requirements of group homes instead of being considered a family." *Id.* at 372. However, Mr. Lauber was directed by a member of the Governor's staff to not raise those concerns with the cities he was advising due to electoral concerns. *Id.* at 373 & 379 n.1.

Instead, Mr. Lauber described the City's zoning plan as "excellent" and "Mr. Lauber specifically cited the 600 foot spacing requirement as an 'essential criteri[um].'" *Id.* at 383 (alteration in original). In the City's summary judgment motion attempting to preclude the USA from seeking a civil penalty, the City argued that Mr. Lauber's withheld concerns from 1990 were strong evidence that the City lacked any intent to discriminate against the disabled in 2016. *Id.* The Court was not persuaded, as "[e]ven if the law concerning the FHA's disability provisions was unsettled in 1990, it was not unsettled in 2016." *Id.* at 384.

Now, in arguing against finding the City's conduct culpable, the City points to the work of another zoning expert, Mr. Ron Cope. City Resp. Civil Penalties 4–5. "In 1999, the City engaged another legal zoning expert, attorney Ron Cope, to review its ordinance and advise on revisions that might be necessary." *Id.* at 4. The City claimed "a thorough search of the City's zoning files discovered no references by Mr. Cope to the group home ambiguity, and no

12

amendments related to group homes were adopted to the code," supported by an affidavit from one of the City's current zoning employees and the consulting agreement with Mr. Cope. *Id.* at 5; *see also* McLaughlin Aff., City Resp. Civil Penalties Ex. 1, ECF No. 161-1; Ordinance Authorizing Consulting Agreement, City Resp. Civil Penalties Ex. 2, ECF No. 161-2. Because experts like Mr. Cope did not flag the spacing rule as an issue, the City argues it should not be punished for "the good faith but unsuccessful attempt to comply with the Fair Housing Act." City Resp. Civil Penalties 10. The USA argues the Court should not consider the work of Mr. Cope because of its untimely disclosure, USA Mot. Leave File Reply Supp. of USA's Mot. Award Civil Penalties 1, and further counters that the City's reliance on outdated expert opinions not only does not excuse the City's actions but instead suggests culpability, USA Mem. Civil Penalties 16–18.

The Court remains unpersuaded and agrees with the USA that the evidence related to Mr. Cope is untimely and unpersuasive. Updating the City's supposedly excusable ignorance of the FHA from 1990 to 1999 does nothing to move the needle when binding Seventh Circuit precedent—decided after 1999 but before the City's 2016 zoning enforcement—established the discriminatory nature of the City's conduct. *See Valencia II*, 446 F. Supp. 3d at 384 (citing *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 783–84 (7th Cir. 2002)). Ignorance of the law is no excuse, and the caselaw interpreting the FHA's disability provisions had sufficiently developed by 2016 to find blameworthy the enforcement of this once-dormant, discriminatory spacing rule. *See Oconomowoc Residential Programs*, 300 F.3d at 784 ("When a zoning authority refuses to reasonably accommodate these small group living facilities, it denies disabled persons an equal opportunity to live in the community of their choice."); *cf. Smith & Lee II*, 102 F.3d at 798 (finding a fine was inappropriate where "the state

of the law regarding reasonable accommodations was unsettled at the time Smith & Lee brought its rezoning petition").

Most importantly, the City cannot rely on the outdated opinions of zoning experts when some of those same experts contemporaneously told the City its desired course of conduct would apply different rules to persons with disabilities solely on the basis of disability.  Mr. Lauber himself testified at zoning proceedings that Noble needed to be treated as a family—thereby exempt from the spacing rule applied to group community residences—given the City's definition of family.  Nov. 16, 2016 Springfield Planning and Zoning Commission Meeting Minutes 12–15, USA Mot. Partial Summ. J. Liability Ex. 18, ECF No. 91-18 ("[T]his home is a family [be]cause it meets that definition of family.").

Next, the City argues it was non-culpable because Private Plaintiffs failed to meet the burden imposed by the City's code of showing that Noble would not have a dilatory effect on the pre-existing nearby group home.  City Resp. Civil Penalties 8.  However, Seventh Circuit precedent made clear that once a plaintiff "show[s] that the accommodation it seeks is reasonable on its face . . . . the defendant must come forward to demonstrate unreasonableness or undue hardship in the particular circumstances."  *Oconomowoc Residential Programs*, 300 F.3d at 783.  Again, that the City insisted on adherence to an outdated and improper zoning variance procedure suggests culpability, not its absence.

Finally, the City argues that no "City official was motivated by an intent to discriminate against disabled persons."  City Resp. Civil Penalties 8.  The USA understands this argument to conflate intent with motive or malice.  USA Mem. Civil Penalties 12.  The Court agrees, as it has already found the City intentionally discriminated.  *See Valencia II*, 446 F. Supp. 3d at 381 ("The 600-foot spacing rule on group homes for individuals with disabilities that does not apply on

14

comparable housing for non-disabled individuals plainly imposes discriminatory 'terms' and 'conditions' on housing on the basis of disability, in violation of 42 U.S.C. § 3604(f)(2)."); *see also Bangerter*, 46 F.3d at 1500 ("Here, the Act and the Orem ordinance facially single out the handicapped and apply different rules to them.  Thus, the discriminatory intent and purpose of the Act and Ordinance are apparent on their face.").  The City itself admitted the discriminatory nature of its spacing rule.  *See* Def.'s Am. Answer ¶ 32 ("[T]he City ADMITS that its zoning ordinance applicable to group homes for disabled persons, as in effect on the filing dates of the complaints, discriminated against the residents of the group home located at 2328 Noble Ave., Springfield, IL . . . , on the basis of their disability in violation of federal law.").  Given this admission and the Court's prior findings of intentional discrimination, a civil penalty is "especially appropriate."  *See Smith & Lee II*, 102 F.3d at 798.

The City's argument is better understood as positing that the lack of subjective malice suggests non-culpability.  But the City's attempt to limit culpability to evidence of explicit, out-loud bigotry misunderstands the purpose of the culpability factor, the legislative process, and how discrimination may be entrenched into legislation.  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.").

Instead, the Court finds that the impact, background, sequence, and administrative history of the City's denial of the CPU permit suggest culpability.  *See* USA Mem. Civil Penalties 13 (citing *Arlington Heights*, 429 U.S. at 265–66).  The impact of enforcing the spacing rule would have been to disrupt a successful community-based residence for three persons with disabilities, without providing any appreciable and non-discriminatory benefit to the City.  *See Valencia II*,

446 F. Supp. 3d at 373 ("The home has created no traffic or parking issues for the City. It also has not been the subject of any police or emergency calls, other than a domestic disturbance call in 2014 that was unrelated to and did not involve the residents.").

The background and sequence suggest culpability as the City had notice of Noble's proximity to another group home since September 2014 but only took action in August 2016, coinciding with organized neighborhood opposition to the group home. *Id.* at 376; *see also* Nov. 16, 2016 Springfield Planning and Zoning Commission Meeting Minutes 16–18 (neighbors' concerns about the Noble residence). The timing of enforcement discredits the City's position that it was solely concerned with evenhanded enforcement of its zoning rules. *See Horizon House*, 804 F. Supp. at 696 ("The failure to articulate a legitimate reason, or any reason, as to the 3000 foot spacing requirement is evidence that, when combined with the timing of the ordinance when plaintiff was opening its two homes, establishes that it was a response to community opposition and to outmoded fears about people with mental retardation.").

Finally, the administrative history further establishes the City's culpability. City officials' stated reason for why the City denied Private Plaintiffs' CPU permit and enforced the spacing rule was fear of setting a bad precedent. *Valencia II*, 446 F. Supp. 3d at 382. The fears of why such a precedent would be "bad"—such as intangible costs to the neighborhood from multiple group homes—were, as the Court found and the Seventh Circuit agreed, "entirely speculative." *Valencia I*, 883 F.3d at 970. The first time the spacing rule was used to deny a CPU permit was for a different residence operated by IAG at 137 Pinehurst Drive ("Pinehurst"). USA Mot. Partial Summ. J. Liability 12, ¶ 28, ECF No. 91. City officials made clear that the Pinehurst permit was denied for reasons wholly inapplicable to Noble, such as drains on police resources. *See* Dec. 20, 2016 City Council Meeting Tr. 20–21, USA Mot. Partial Summ. J.

16

Liability Ex. 7, ECF No. 91-7;[5] *see also Oconomowoc Residential Programs*, 300 F.3d at 786 ("A denial of a variance due to public safety concerns or concerns for the safety of the residents themselves cannot be based on blanket stereotypes about disabled persons rather than particularized concerns about individual residents."). Instead, City officials pointed to the spacing rule and IAG's failure to ask the City for permission. Dec. 20, 2016 City Council Meeting Tr. 20:5–6 ("You need to ask permission, not forgiveness."). "The lack of a credible justification for the zoning decision raises an additional inference that the decision was based on impermissible factors," such as disability. *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 49 (2d Cir. 1997), *superseded on other grounds*, *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 171 n.7 (2d Cir. 2001).

        In sum, the City decided to press forward and threaten the dismantling of an effective community-based residence for these individuals, despite binding precedent and contemporaneous warnings. The Court finds the City's actions, taken together as a whole, are sufficiently culpable as to constitute an aggravating factor in the civil penalty analysis.

### C. History of Past Violations

        The Court finds this factor to be mitigating. The USA requests the Court impose a civil penalty at what was formerly the maximum amount for first-time violators of the FHA. USA Mem. Civil Penalties 1, 4–5. The USA points to the Pinehurst enforcement as relevant history under this factor, but points to no prior FHA violations outside of how the City enforced the spacing rule against IAG. *Id.* at 18. The City argues it did not have occasion to enforce the spacing rule until 2016 and claims there "is no instance of past animus or discrimination directed

---

[5] An alderman stated: "[Y]our situation over on Noble, from what I understand from Alderman McMenamin and from the home owner, yours is completely different than the issues I had on Pinehurst. We had police presence, we had violence, we had workers that were threatening people in front of residence, in front of homeowners. . . . You guys have been there for three years with no issues." Dec. 20, 2016 City Council Meeting Tr. 20:16–21:2.

at disabled persons."  City Resp. Civil Penalties 8.  The USA counters that this lack of previous

enforcement is more reflective of Illinois's status as a "laggard outlier" in providing community

services for persons with intellectual disabilities than the City's conduct.  USA Mem. Civil

Penalties 18 n.9 (quoting *Ill. League of Advocs*., 803 F.3d at 874).  The Court declines to

speculate as to that causal relationship and finds the City's lack of prior FHA violations is a

mitigating factor in the civil penalty analysis.

### D.  Financial Circumstances of the Defendant and the Goal of Deterrence

The Court finds this factor to be particularly mitigating in the civil penalty analysis.  The

City does not squarely address this factor but argues "[t]he City and its taxpayers are not

deserving of punishment for the good faith but unsuccessful attempt to comply with the Fair

Housing Act."  City Resp. Civil Penalties 10.  As to financial circumstances, the USA argues a

penalty of "$107,050, represents just .04% of the City's annual budget."  USA Mem. Civil

Penalties 19.  The USA argues a civil penalty "is necessary to deter both Springfield and other

municipalities from committing similar future violations."  *Id.*  The Court agrees that the goals of

general deterrence would be furthered by imposing a civil penalty here.  *See Smith & Lee II*, 102

F.3d at 798 (noting that future municipal defendants would be on notice as to operation of the

FHA's disability provisions); *United States v. Shanrie Co.*, No. 05-306-DRH, 2008 WL

4566309, at *2 (S.D. Ill. Oct. 1, 2008) ("[T]he Court can take into account general deterrence

when imposing civil penalties." (citing *Krueger v. Cuomo*, 115 F.3d 487, 493 (7th Cir. 1997)).

But as to "punishing" the City's taxpayers, the Court finds the Seventh Circuit's

analogous discussion of punitive damages under the False Claims Act ("FCA") in *United States

ex rel. Chandler v. Cook County*, 277 F.3d 969, 977–79 (7th Cir. 2002), *aff'd*, 538 U.S. 119

(2003), instructive.  The Seventh Circuit found the FCA's punitive damage scheme

distinguishable from the scheme imposed for 42 U.S.C. § 1983 actions, under which

municipalities are exempt.  *Id.* at 978 (citing *City of Newport v. Fact Concerts*, 453 U.S. 247,

267 (1981)).  The Seventh Circuit found municipal defendants were not exempt from treble

damages under the FCA because, *inter alia*, "any ill-gotten gains from the federal government

produce more services or lower taxes," such that punishments falling on taxpayers were

justifiably offset by such gains.  *Id.*  Here, the taxpayer received no benefit from imperiling the

private provision of a community-based residence for persons with disabilities.  *See Valencia II*,

446 F. Supp. 3d at 373 (finding no traffic, parking, or police/emergency resource drains due to

Noble).  That the City's taxpayers enjoyed no ill-gotten gains and will instead foot the bill for

City officials' conduct suggests that financial circumstances are a mitigating factor here.

### E.  Other Matters that Justice May Require

The Court finds that the other relief imposed in this case are mitigating factors.  The City

does not address this factor but the USA requests the Court consider "the City's efforts to

compound and prolong this litigation by raising arguments that it knew had no basis in law or

fact," referring in part to the City's strained interpretation of "family" as defined in the zoning

code.  USA Mem. Civil Penalties 20–21.  The Court declines to transform the civil penalty issue

into an analysis of whether the City previously advanced sanctionable and frivolous arguments.

*See* Fed. R. Civ. P. 11(c)(2) ("A motion for sanctions must be made separately from any other

motion . . . .").

Under this factor, other courts have considered the civil penalty in context of other relief

awarded in the given case.  For example, where a jury found injuries of $5,200,000, another

court thought the size of such award merited the imposition of the maximum statutory penalty

under a state-law version of the FHA to deter the relevant pattern or practice.  *Cooke v. Town of*

*Colorado City*, No. CV-10-08105-PCT-JAT, 2014 WL 4371430, at *3 (D. Ariz. Sept. 4, 2014)

(subsequent history omitted).  Contrast with *United States v. Page Properties, Inc.*, 198 F.3d

252, *1 (8th Cir. 1999) (unpublished), wherein the district court found a pattern and practice of

discrimination by two individuals but refused to impose any civil penalty as "penalties would do

little to deter future discrimination in light of the expansive injunction."

Here, a jury imposed a significant but comparatively smaller damages award totaling

$293,000.  Verdict Form 1–4.  Although the Court declines to impose the full suite of equitable

relief requested by the USA, the City will be subject to an injunction which appropriately

restrains the City from future FHA violations.  The other relief awarded in this case suggests this

factor is mitigating in this case.  *See Page Properties*, 198 F.3d 252, *1.

### F.  A Civil Penalty of $61,982.50 Is Appropriate

The Court finds a penalty of $61,982.50 to be warranted.  Particularly instructive is the

decision in *Borough of Audubon*, 797 F. Supp. at 363.  There, the court awarded a civil penalty

of $10,000—representing 20% of the maximum at that time for first-time violators—noting that

the court's finding that city "officials acted with an intent to discriminate on the basis of

[disability]" meant a "penalty [wa]s necessary to serve the purposes of both retribution and

deterrence."  *Id.*  But that court thought the maximum penalty was inappropriate because "there

[wa]s no evidence in the record that Audubon has engaged in discriminatory conduct outside the

context of this case; and, without such evidence, [the court was] willing to view this case as an

aberration which necessitates less than the maximum penalty allowed by law."  *Id.*[6]

---

[6] *See also Shanrie Co.*, 2008 WL 4566309, at *2 (entering a civil penalty of $25,000, slightly less than half of the inflation-adjusted statutory maximum, because the court did "not find the [d]efendants' conduct to be of the egregious level that justifies a maximum penalty"); *United States v. Dawson Dev. Co., LLC*, No. CV-05-S-095-M, 2006 WL 8438016, at *20–21 (N.D. Ala. Aug. 16, 2006) (reviewing cases imposing the maximum civil penalty and distinguishing the instant case due to the defendant's lack of prior FHA violations and his financial circumstances).

Here, the nationwide and statewide trend towards community-based residences, the City's facially discriminatory ordinance, the lack of any credible, non-discriminatory justification for enforcing the spacing rule, and the need for general deterrence are all aggravating factors. But ultimately the City's taxpayers are the ones that must foot this bill, not the City officials from the 1990s or 2016. This fact—coupled with the other relief awarded in this case—mandate a penalty no greater than what is necessary to make clear to municipalities that these facially discriminatory spacing rules may not be used to hinder the trend of shifting persons with disabilities from institutions to community-based residences. A civil penalty of $61,982.50 is necessary to achieve that purpose.

## III.    Scope of Equitable Relief

As part of the Court's order granting the USA's summary judgment motion on liability, the City was directed to file a plan designed to remediate its FHA violations. *Valencia II*, 446 F. Supp. 3d at 385. The City complied and filed a remediation plan, albeit past the deadline imposed by the Court's summary judgment order. Def.'s Mot. Leave File Remediation Plan. The USA disputes the sufficiency of the City's proposed remediation plan and requests that the Court enter more sweeping equitable relief. USA Br. Inj., ECF No. 124.

The City's proposed remediation plan states:

1. The City will amend its zoning ordinance to change the sections which violate the Fair Housing Act or which, through enforcement, may violate the Fair Housing Act.
2. The amendments to be considered by the City Council will include:
   a. Amending the definition of "Community residence" to cover residences for up to 4 disabled persons, and expressly providing that such residences shall be considered "Family" for all purposes under the zoning provisions.
   b. Amending the definition of "Family care residence" to be a group of 5 or 6 persons with disabilities.
   c. Amending the definition of "Group community residence" to be groups of 7 to 15 persons with disabilities.

> d. Amending the definition of "Family" to more accurately reflect modern familial relationships, as well as unrelated groups of up to 4 persons.
> e. Eliminating spacing requirements for all Family care residences; the only requirement for such residences shall be state licensure.
> f. As an accommodation for family care residences which do not have state licensure, a conditional permitted use may be granted upon demonstrating that the lack of a license is not detrimental to the surrounding residences.

Def.'s Mot. Leave File Remediation Plan 1–2. The USA finds the City's proposal "clearly inadequate," USA Br. Inj. 7, and instead proposes the Court:

> (1) enjoin the City for three years from discriminating on the basis of disability in enacting and enforcing its zoning and land use laws, ordinances, policies, and practices; (2) order the City to repeal—and not simply amend—its discriminatory spacing rule; (3) continue to enjoin the City from evicting the residents of 2328 S. Noble Avenue; (4) order the City to enact a reasonable accommodation policy separate from its CPU process; (5) order the City to attend fair housing training; and (6) order the City to maintain and allow reasonable access by the United States to the City's records for compliance purposes.

*Id.* at 5.

> Demonstrating entitlement to a permanent injunction typically requires the movant show:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). The FHA specifically authorizes injunctive relief. 42 U.S.C. § 3614(d)(1)(A) ("[T]he court may award such preventive relief, including a permanent or temporary injunction . . . as is necessary to assure the full enjoyment of the rights granted by this subchapter."). Proof of a pattern or practice of discrimination under the FHA "creates a presumption that an injunction is appropriate," which may be rebutted by showing "such relief is not necessary because there is little or no danger of current violations." *United States v. Balistrieri*, 981 F.2d 916, 934 (7th Cir. 1992) (quotation marks omitted). A statutory injunction may be proper, even where entitlement under *eBay* is not shown, if "a

violation was demonstrated and there was a reasonable likelihood of future violations." *Sierra Club v. Franklin Cnty. Power of Ill.*, 546 F.3d 918, 935 (7th Cir. 2010). However, an injunction must "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1); *see also United States v. Apex Oil Co.*, 579 F.3d 734, 739 (7th Cir. 2009) ("We have insisted on strict compliance with these requirements.").

The Court finds that the City has not rebutted the presumptively available injunction here. The Court previously found "the City is liable for engaging in a 'pattern or practice' of discrimination in this case." *Valencia II*, 446 F. Supp. 3d at 382. The City's non-specific promises to repeal the at-issue ordinance and proposals to exclude more persons with disabilities from the definition of "family" leads the Court to conclude there is a reasonable likelihood of future discrimination in the absence of injunctive relief because the individuals continue to reside at the Noble residence and IAG seeks to open new group homes within the City. *See* USA Br. Inj. Relief 8. Some form of injunctive relief is clearly warranted, but the USA's requested injunction is far too broad and exceeds the proper role of Article III courts. The components of the USA's requested injunctive relief are analyzed in turn.

### A. Enjoin the City from Discriminating on the Basis of Disability in Zoning and Land Use

"[A]ffirmative injunctive relief for past discriminatory practices is appropriate where the trial court believes that the vestiges of prior discrimination linger and remain to be eliminated." *United States v. Di Mucci*, 879 F.2d 1488, 1498 (7th Cir. 1989) (quotation marks omitted); *see also United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (injunctive relief should not be granted unless "there exists some cognizable danger of recurrent violation"). "The absence of any persuasive indications that a past pattern or practice of discrimination has ceased may justify

injunctive relief." *Di Mucci*, 879 F.2d at 1498.  However, "in considering whether to grant injunctive relief a court should impose upon a defendant no restriction greater than necessary to protect the plaintiff from the injury of which he complains."  *Id.* at 1499 (quotation marks omitted).  "A mandatory injunction imposes significant burdens on the defendant and requires careful consideration of the intrusiveness of the ordered act, as well as the difficulties that may be encountered in supervising the enjoined party's compliance with the court's order."  *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 892 (7th Cir. 2011).

The USA requests the Court "enjoin the City from discriminating against people with disabilities for the next three years in the area of zoning and land use."  USA Br. Inj. 8.  The USA admits it seeks an "obey-the-law" mandatory injunction with this requested relief.  *Id.* (citing *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 842–43 (7th Cir. 2013)).  Obey-the-law injunctions raise both overbreadth and vagueness concerns and are typically disfavored.  *AutoZone*, 707 F.3d at 842–43.  The Court declines to impose the USA's requested obey-the-law injunction for three reasons.

First, the USA's proposed obey-the-law injunction's scope is far broader than what Plaintiffs targeted with this suit, namely a discriminatory pattern or practice in enforcement of a specific spacing rule applicable to housing for persons with disabilities and the interpretation of "family" as defined by the City's zoning code.  *E.g.*, Case No. 3:17-cv-03278, Compl. ¶¶ 1, 8.  The instant matter has reinforced what was already clearly established: Using spacing rules in municipal zoning ordinances to deprive persons with disabilities of the ability to live in community-based residences—solely on the basis of disability—is unacceptable.  *See Smith & Lee II*, 102 F.3d at 790 ("Otherwise lawful governmental actions become unlawful when done for the purpose of disadvantaging [persons with disabilities].");  *see also Sharpvisions, Inc. v.*

24

*Borough of Plum*, 475 F. Supp. 2d 514, 526–27 (W.D. Pa. 2007) ("[D]efendants have violated

both the spirit and intent of the Fair Housing Act by limiting the definition of 'family' in the

Plum Borough Ordinance to exclude one mentally handicapped individual from living in a single

family home of his or her choice, while permitting up to five unmarried individuals to live in a

single family home without any restrictions.").

But discrimination against persons with disabilities neither begins nor ends with spacing

rules, and zoning and land use decisions profoundly impact many aspects of a municipality's

governance. *See, e.g.*, *Vill. of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 394–95 (1926)

(describing the import of zoning decisions); *Hemisphere Bldg. Co. v. Vill. of Richton Park*, 171

F.3d 437, 439 (7th Cir. 1999) (declining to "infer discriminatory intent from the fact . . . that the

Village had no good reason to turn [the plaintiff] down, given the nature of the land uses in the

vicinity of the lot"). Broadly prohibiting disability discrimination in all the City's zoning and

land use decisions imposes upon the City duplicative requirements to follow federal law and

constitutes a "restriction greater than necessary to protect the plaintiff from the injury of which

[it] complains." *Di Mucci*, 879 F.2d at 1499 (quotation marks omitted).

Second, "supervising the enjoined party's compliance" with the proposed obey-the-law

injunction would be difficult. *Kartman*, 634 F.3d at 892. This obey-the-law injunction fails to

describe in reasonable detail which acts are restrained or required and was not stated with

sufficient specificity. *See* Fed. R. Civ. P. 65(d)(1). The USA would be able to use this

injunction to bypass the normal procedural requirements of a lawsuit—even if only for three

years—and subject the City to civil contempt proceedings based on any zoning or land use

decision's alleged discrimination on the basis of disability. Other courts have recognized how "a

judicial finding of a constitutional defect may easily give rise to a temptation to right the wrong

by assuming control of the entire system in which the offensive condition exists." *Knox v. Salinas*, 193 F.3d 123, 129–30 (2d Cir. 1999) (per curiam) (quotation marks omitted). The Court will decline the USA's invitation to assume even time-limited supervisory control over the City's entire zoning regime based on a finding that it violated federal law in one way.

Third, the USA's primary citation in support of its obey-the-law injunction, *AutoZone*, is distinguishable. USA Br. Inj. 8–9. The Seventh Circuit has described how anti-discrimination statutes in the employment law context grant courts "broad statutory authority to fashion appropriate remedies, including injunctive relief, for proven violations of the anti-discrimination laws." *AutoZone*, 707 F.3d at 842 (Title VII employment discrimination). The Supreme Court similarly has recognized "the FHA's broad and inclusive compass" which requires a "generous construction" of provisions of the FHA. *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731 (1995) (quotation marks omitted). The Seventh Circuit identified factors relevant to the propriety of time-limited obey-the-law injunctions against employers, such as:

> [(1)] when the victorious employee remains at the company or has been reinstated; [(2)] where the particular employees or supervisors responsible for the illegal conduct remain at the company; [(3)] and/or where the employer has taken some particular action—like withdrawing an accommodation policy—that convinces the court that voluntary compliance with the law will not be forthcoming.

*AutoZone*, 707 F.3d at 842–43. The USA argues those factors are present here because (1) the residents continue to live in the City and IAG seeks to open new group homes in the City, (2) many of the same City officials remain in place, (3) the City has yet to take any action to amend its spacing rule despite representing to the Court that it would, and (4) the City's proposed remediation plan is plainly inadequate and seeks to remove more living arrangements from the ambit of "family." USA Br. Inj. 5 n.3, 8–9.

As will be further explained below, enjoining enforcement of the spacing rule and CPU process satisfies the remedial requirements of what has been proven in this matter, such that a broad obey-the-law injunction is unnecessary. *See Hum. Res. Rsch. & Mgmt. Grp., Inc. v. Cnty. of Suffolk*, 687 F. Supp. 2d 237, 268 (E.D.N.Y. 2010) (declining to "permanently enjoin Suffolk County from unlawfully discriminating" while "enjoining enforcement of the challenged provisions" of Suffolk County's code because "the Court allows the defendant a good faith presumption of compliance with the spirit and letter of the Court's ruling in the instant case" (quotation marks omitted)). The Court is not convinced that the City's "plainly inadequate" remediation plan establishes the City will not voluntarily comply with the law in its future zoning enactments in the absence of an obey-the-law injunction. *Cf.* USA Br. Inj. 9.

The City has already incurred the fees and costs of years of litigation, compensatory damage awards, and now a civil penalty. *See Saunders v. Gen. Servs. Corp.*, 659 F. Supp. 1042, 1060 (E.D. Va. 1987) (declining to award affirmative injunctive relief in an FHA case because other relief "will adequately redress plaintiffs' injuries and provide assurances that defendants will not engage in future violations"). While the City's proposed remediation plan suggests some permanent equitable relief is justified, it does not suggest an obey-the-law injunction is necessary or equitable.

### B. Order the City Repeal Certain Ordinances and Enact Others

The Court declines to unduly interfere with the City's legislative process by ordering them to repeal or enact certain ordinances. The USA requests the Court order the City "to repeal—and not simply amend—its discriminatory spacing rule," as well as "enact a reasonable accommodation policy separate from its CPU process." USA Br. Inj. 5. The USA cites no authority for directing equitable powers towards the City's legislative process in this way, but

argues it is warranted because the City has failed to voluntarily repeal the spacing requirement.
*Id.* at 9–10.  Such relief exceeds the proper role of Article III courts.  *See Smith & Lee II*, 102
F.3d at 797 ("[The district court] did not have power to order [the city] to pass the Court's own
amendment.  The choice of how to comply with this opinion by accommodating the elderly
disabled rests with the City Council, not the Court."); *cf. Lewis v. Casey*, 518 U.S. 343, 349
(1996) ("[I]t is not the role of courts, but that of the political branches, to shape the institutions of
government in such fashion as to comply with the laws and the Constitution."). The Court
declines to order the City to repeal the spacing rule.

The City's spacing rule, § 155.053, refers to the CPU process, enacted at § 155.187.  *See*
Springfield, Ill., Code of Ordinances § 155.053(c) (2023) ("Any family care residence or group
community residence not in compliance with either provision (a) or provision (b) above may
seek a conditional permitted use under section 155.187 of the zoning ordinance.").  The City's
remediation plan states it intends to continue to require family care residences to "demonstrat[e]
that the lack of a license is not detrimental to the surrounding residences," when seeking a
reasonable accommodation.  Def.'s Mot. Leave File Remediation Plan 2; *see also* Springfield,
Ill., Code of Ordinances § 155.053(b) (2023) (requiring group community residences and family
care residences be "licensed or approved by the State of Illinois").  While the Court declines to
order the City enact the USA's preferred procedure for handling accommodation requests, the
Court reiterates that the FHA "requires accommodation if such accommodation (1) is reasonable,
and (2) necessary, (3) to afford a handicapped person the equal opportunity to use and enjoy a
dwelling."  *Oconomowoc Residential Programs*, 300 F.3d at 783.  Once plaintiffs show "the
accommodation it seeks is reasonable on its face . . . the defendant must come forward to
demonstrate unreasonableness or undue hardship in the particular circumstances."  *Id.*

28

A process which conditions issuance of a CPU permit upon a plaintiff's demonstration "that the lack of a license is not detrimental to the surrounding residences," Def.'s Mot. Leave File Remediation Plan 2, would likely not comply with the FHA as such burden must be placed on the defendant after the plaintiff makes its initial showing. The Court counts on City officials' consideration of this point in deciding how to comply with the FHA going forward.

### C.  Continuance of Injunction Against Eviction of Noble Residents and Enjoining Enforcement of Spacing Rule

The Court grants the USA's request that the City remain enjoined from evicting the residents of 2328 S. Noble. *See* USA Br. Inj. 10. As this Court previously found at the preliminary injunction stage, the Noble residents "will suffer immediate and irreparable harm if they remain subject to eviction from the Noble Home." *A.D. ex rel Valencia*, 2017 WL 3288110, at *7. Most of the Noble residents continue to reside at Noble and IAG continues to operate within the City, so this relief is appropriate to remedy such irreparable harm. The City is enjoined from taking any action against the owner(s) or resident(s) of 2328 S. Noble Avenue, or IAG, in order to prevent or restrict the operation of a group home for five or fewer persons with disabilities at 2328 S. Noble Avenue.

The Court also finds the City should be enjoined from enforcing the spacing rule for group homes with five or fewer individuals. *See* USA Br. Inj. 9. This relief is typical in FHA cases upon a showing of facial discrimination. *See, e.g.*, *Hum. Res. Rsch. & Mgmt. Grp.*, 687 F. Supp. 2d at 267–68 (enjoining enforcement of facially discriminatory ordinance). The City is enjoined from enforcing the spacing rule, § 155.053, against the residents of 2328 S. Noble Avenue or any other similarly situated family care residence or group community residence with five or fewer individuals. *See* Springfield, Ill., Code of Ordinances § 155.053 (2023).

### D.  FHA Training and Records Access

The Court also grants the USA's requested injunction as it relates to requiring City officials complete FHA training and maintain records for the USA's access to ensure FHA compliance.  USA Inj. Br. 12.  Such training is commonly ordered in FHA cases.  *See, e.g.*, *Shanrie Co.*, 2008 WL 4566309, at *3 ("Defendants shall ensure that their agents and employees read and understand the terms of the Court's injunctive relief, and that the Defendants, as well as certain agents and employees, shall receive FHA training.").  The Court finds such training especially appropriate here, considering the dearth of FHA training for City employees.  *See* Dep. Matthew McLaughlin 316:21–318:10, USA Mot. Partial Summ. J. Liability Ex. 10, ECF No. 91-10 (describing the lack of mandatory FHA trainings for City zoning employees).

Similarly, the Court grants the USA's requested injunction as it relates to record keeping.  USA Br. Inj. 12.  Record keeping requirements are a common form of relief in FHA cases and are warranted here.  *See, e.g.*, *Shanrie Co.*, 2008 WL 4566309, at *3 ("Defendants shall maintain, and provide to the United States upon request, records related to the training and education requirements . . . and also report to the United States regarding any future housing-discrimination complaints.").  Allowing the USA to monitor future compliance more adequately respects federalism than ordering the City enact or repeal certain ordinances while still ensuring the City will fulfill its obligations under the FHA.

## IV.  Attorneys' Fees and Costs

Private Plaintiffs[7] filed their first fees motion on August 9, 2022.  Pls.' Mot. Att'ys' Fees. Plaintiffs anticipated more fees would accrue in litigating post-trial motions and noted this motion was filed "in an abundance of caution . . . to preserve their claim for attorneys' fees and

---

[7] Only Private Plaintiffs are eligible for an award of attorneys' fees.  *See* 42 U.S.C. § 3613(c)(2) (providing for fee awards to "the prevailing party, other than the United States"); *id.* § 3614(d)(2) (same).

expenses and this Court's jurisdiction over the same." *Id.* ¶ 4.  Recognizing the preliminary

nature of Plaintiffs' motion, the City moved on August 15, 2022, to extend its deadline to

respond to Plaintiffs' fees motion until after Private Plaintiffs file a supplemental motion.  Def.'s

Mot. Extend Deadline Respond Att'ys' Fees Mot.  The Parties have yet to fully brief the

attorneys' fees and costs issue as both sides anticipated future post-trial briefing in this matter.

*See* Pls.' Mot. Att'ys' Fees ¶ 9 ("Once those issues are resolved, and post-trial motions are

briefed in full, Plaintiffs will supplement this motion accordingly."); Def.'s Mot. Extend

Deadline Respond Att'ys' Fees Mot. ¶ 4 ("Defendant does anticipate filing a response to

Plaintiffs' motion for attorneys' fees, but is unable to respond to the specifics of the Plaintiffs'

current fee request because it is incomplete.").

 Without the entry of a final judgment, these motions are unnecessary precautions.  Both

motions are denied without prejudice.  Plaintiffs may file a renewed motion regarding attorneys'

fees, and the City's response, if any, must be submitted within two weeks of Plaintiffs' timely

renewed motion.

## V. Entry of Final Judgment and Ancillary Relief

 The jury rendered its compensatory damages verdict on July 26, 2022.  On November 10,

2022, Plaintiffs requested the Court enter final judgment, award prejudgment interest, and award

any accrued post-judgment interest on the jury's damages awards, in addition to addressing

issues of injunctive relief, civil penalties, and attorneys' fees.  Pls.' Mot. Entry Final J. Jury's

Verdict ¶¶ 1–5.[8]

---

[8] Here, neither Private Plaintiffs nor the USA included a request for prejudgment interest in their operative complaints.  *See* Am. Compl. ¶ 74; Case No. 3:17-cv-03278, Compl. ¶ 30.  Such failure to specifically plead does not preclude the award of prejudgment interest.  *See* Fed. R. Civ. P. 54(c) ("Every other final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."); *see also Smart Mktg. Grp. v. Publications Int'l Ltd.*, 624 F.3d 824, 833 (7th Cir. 2010) (explaining that motions for prejudgment interest must be filed before judgment is entered).  Plaintiffs' request for prejudgment interest prior to the entry of final judgment is sufficient.  *See* Pls.' Mot. Entry Final J. Jury's Verdict ¶ 1.

The Court awards prejudgment interest for IAG's damages but not the individuals'
emotional damages.  Beginning with the statute's text, the FHA authorizes prejudgment interest,
stating the court "may award such other relief as the court deems appropriate, including
monetary damages to persons aggrieved."  42 U.S.C. § 3614(d)(1)(B); *see also id.* § 3613(c)(1)
(similar).  "Prejudgment interest, of course, is 'an element of complete compensation.'" *Loeffler
v. Frank*, 486 U.S. 549, 558 (1988) (quoting *West Virginia v. United States*, 479 U.S. 305, 310
(1987)).  Prejudgment interest makes compensation complete by recognizing the time-value of
money, not by punishing the defendant. *Thorncreek Apartments III, LLC v. Mick*, 886 F.3d 626,
637 (7th Cir. 2018); *see also Williamson v. Handy Button Mach. Co.*, 817 F.2d 1290, 1297 (7th
Cir. 1987) ("Money today is simply not a full substitute for the same sum that should have been
paid some time ago.").

"Federal common law authorizes the award of [prejudgment] interest in appropriate cases
to victims of violations of federal law." *Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874
F.2d 431, 436 (7th Cir. 1989); *see also Monessen Sw. Ry. Co. v. Morgan*, 486 U.S. 330, 335–36
(1988) (finding state court erred in determining "the availability of prejudgment interest in
[Federal Employers' Liability Act] actions [w]as a matter of state law rather than federal law").
The Seventh Circuit "has long applied a presumption in favor of awarding prejudgment interest
to victims of federal law violations." *Fed. Deposit Ins. Corp. v. Chi. Title Ins. Co.*, 12 F.4th 676,
684 (7th Cir. 2021).  In determining whether to award prejudgment interest, "Congress'
overriding purpose" in enacting the federal statute should be considered, which may dictate
prejudgment interest should ordinarily be awarded. *See Gen. Motors Corp. v. Devex Corp.*, 461
U.S. 648, 655–57 (1983) (concluding that Congress's overriding purpose under the damages
statute for patent litigation, 35 U.S.C. § 284, was "affording patent owners complete

compensation"). The FHA must be interpreted broadly to effective Congress's goal of providing "for fair housing throughout the United States." *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1289 (7th Cir. 1977) (quoting 42 U.S.C. § 3601).

Prejudgment interest "should be awarded unless there is a sound reason not to do so." *Matter of Milwaukee Cheese Wis., Inc.*, 112 F.3d 845, 849 (7th Cir. 1997). Such sound reasons include, but are not limited to, "[s]ubstantial, unexplained delay in filing suit" or "[t]he size of the jury's verdict . . . , if only the supposition that the jury has compensated plaintiff for the time value of money can explain the result." *Williamson*, 817 F.2d at 1298; *accord City of Milwaukee v. Cement Div., Nat. Gypsum Co.*, 515 U.S. 189, 196 (1995) ("Other circumstances may appropriately be invoked as warranted by the facts of particular cases."). "The decision to award prejudgment interest lies within the discretion of the district court." *Pickett v. Sheridan Health Care Ctr.*, 813 F.3d 640, 647 (7th Cir. 2016).

Where awarded, prejudgment interest is also typically compounded. *Am. Nat. Fire Ins. Co. ex rel. Tabacalera Contreras Cigar Co. v. Yellow Freight Sys., Inc.*, 325 F.3d 924, 937–38 (7th Cir. 2003) ("[C]ompound prejudgment interest is the norm in federal litigation." (quotation marks omitted)). "District courts are directed to 'use the prime rate for fixing prejudgment interest where there is no statutory interest rate.'" *Scott v. Peterson*, No. 09-cv-1633, 2010 WL 3173001, at *3 (N.D. Ill. Aug. 11, 2010) (quoting *Gorenstein Enters.*, 874 F.2d at 436). The FHA does not statutorily specify a rate of prejudgment interest. 42 U.S.C. § 3613(c)(1). Prejudgment interest should be awarded "from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress." *West Virginia*, 479 U.S. at 310 n.2.

33

Typically, prejudgment interest is appropriate for economic harms. *See, e.g.*, *Gorenstein Enters.*, 874 F.2d at 434 (affirming award of prejudgment interest on damages for trademark infringement); *Williamson*, 817 F.2d at 1296–99 (reversing for failure to award prejudgment interest on backpay award); *Matarese v. Archstone Pentagon City*, 795 F. Supp. 2d 402, 445 (E.D. Va. 2011), *aff'd in part, vacated in part sub nom. Matarese v. Archstone Communities, LLC*, 468 F. App'x 283 (4th Cir. 2012) (awarding prejudgment interest on damages for overpayment of rent in an FHA case). The caselaw on noneconomic harms is more mixed.[9] The Seventh Circuit has held that the law does not categorically preclude "an award of prejudgment interest on intangible damages." *Hillier v. S. Towing Co.*, 740 F.2d 583, 586 (7th Cir. 1984). But it is not required. *See DeMauro v. Loren-Maltese*, No. 98 C 8318, 2007 WL 9821268, at *3 (N.D. Ill. Sept. 25, 2007) (declining to award prejudgment interest on non-economic portion of jury's verdict).

The jury's compensatory damages award can be divided into three buckets: (1) the individuals' emotional harms (total of $162,000), (2) IAG's diverted resources ($83,000), (3) IAG's loss of revenue ($48,000). Verdict Form 1–4. As to the second and third buckets—IAG's damages combined for a total of $131,000—prejudgment interest is warranted. Had IAG been able to productively invest the resources spent combatting the City's discriminatory ordinance on establishing new group homes or expanding existing ones, it would have seen a return on their

---

[9] For example, there is a stark split between how the Fifth Circuit and Third Circuit approach prejudgment interest for non-economic losses. *Compare Thomas v. Texas Dep't of Crim. Just.*, 297 F.3d 361, 372 (5th Cir. 2002) ("Prejudgment interest should apply to all past injuries, including past emotional injuries."), *with Robinson v. Fetterman*, 387 F. Supp. 2d 483, 485 (E.D. Pa. 2005) (surveying Third Circuit cases to conclude binding precedent precluded prejudgment interest for non-economic losses in 42 U.S.C. § 1983 cases). In the absence of binding precedent settling the propriety of awarding prejudgment interest on non-economic losses recovered under federal law, courts have exercised their discretion to decline to award prejudgment interest. *See Valenzuela v. Coleman*, No. 18-cv-00329-CMA-STV, 2022 WL 2528330, at *12 (D. Colo. July 7, 2022) (finding "prejudgment interest on Plaintiff's noneconomic damages would not be compensatory in this [§ 1983] case" in the absence of controlling Tenth Circuit precedent).

investment.  The business revenues lost due to the City's discrimination similarly could have

been productively reinvested.  Because the jury found the City's discrimination prevented IAG

from making good use of those amounts, awarding prejudgment interest is necessary to

recognize the time-value of that award and make IAG's compensation complete.  *See Loeffler*,

486 U.S. at 558.

The City alerted Christine and Robyn Hovey, the owners of Noble, to potential zoning

enforcement on August 10, 2016.  USA Mot. Partial Summ. J. Liability Ex. 41, ECF No. 91-41

(letter from City's Building and Zoning Department to Christine and Robyn Hovey requesting

they contact the City "regarding the use" of 2328 Noble Avenue); *see also* Def.'s Am. Answer

¶ 27 (admitting the City reached out to the Hovey's attorney in August 2016 regarding Noble).

Private FHA claims accrue upon "the occurrence or the termination of an alleged discriminatory

housing practice," and therefore August 10, 2016, is the appropriate starting date for calculating

prejudgment interest.  *See* 42 U.S.C. § 3613(a)(1)(A).  Judgment will be entered today,

December 5, 2023.  Applying a weighted average of the prime interest rate between August 10,

2016, and December 5, 2023, to the jury's award of $131,000 and compounding annually

dictates the appropriate amount of prejudgment interest is $53,654.50.[10]  *See Scott*, 2010 WL

3173001, at *3 n.2 (using a similar calculation).

---

[10] Taking a weighted average of the historical prime interest rate between August 10, 2016, and December 5, 2023 (2634 days or 7.22 years), results in an effective prime rate of 4.78%.  *See Bank Prime Loan Rate Changes: Historical Dates of Changes and Rates (PRIME)*, Fed. Rsrv Bank of St. Louis, https://fred.stlouisfed.org/series/PRIME (last visited Dec. 5, 2023) (change starting date to "2015-12-16" (capturing the prime rate in effect on August 10, 2016), ending date to "2023-07-27" (the most recent date for which data was available), download the data, calculate the number of days for which each prime rate was in effect, and then multiply each rate by that number of days, dividing by the total number of days between claim accrual and judgment; sum up the resulting figures for each prime rate to get the weighted average).  Compound interest was calculated via the formula of $A = P(1+r/n)^{nt}$, where A is the combined total of principal and interest, P is the principal amount, r is the prime interest rate expressed as a decimal, n is the number of compounding periods per unit of time, and t is time in decimal years. Here, P is 131,000, r is 0.0478, n is 1, and t is 7.35. $A = 131,000(1+(.0478/1))^{1*7.35} = 184,654.50$. Subtracting the principal ($131,000) results in prejudgment interest of $53,654.50.

But the Court exercises its discretion to decline to award prejudgment interest for the individuals' emotional harms. Emotional damages are meant to make victims of unlawfully inflicted negative emotions whole—a rough substitute for the law's inability to turn back the sands of time. Whereas wrongfully withheld rent may be productively invested, one cannot invest their absence of eviction-related anxiety or feelings of housing security into a mutual fund and expect a healthy return. *Cf. Teen Challenge Int'l v. Metro. Gov't of Nashville & Davidson Cnty.*, No. 3:07-00668, 2009 WL 2151379, at *2 (M.D. Tenn. July 17, 2009) ("The purpose of an award of prejudgment interest is to 'compensate a deserving party for 'loss of the use' of its funds.'" (quoting *Union Planters Bank, N.A. v. Cont'l Cas. Co.*, 478 F.3d 759, 767 (6th Cir. 2007))). Here, the jury's award is sufficient compensation for Private Plaintiffs' emotional harm and prejudgment interest is inappropriate. *See Valenzuela v. Coleman*, No. 18-cv-00329-CMA-STV, 2022 WL 2528330, at *12 (D. Colo. July 7, 2022) ("[T]he jury heard testimony that Plaintiff's pain and suffering and reputational harm extended for months and years after Plaintiff's arrest in 2017. Thus, the Court finds in its discretion that the jury reasonably could have ascertained Plaintiff's noneconomic damages calculated to the time of trial.").

## CONCLUSION

Accordingly, the City's Motion for Leave to File Remediation Plan, ECF No. 116, is GRANTED; the USA's Motion for an Award of Civil Penalties, ECF No. 134, is GRANTED in part and DENIED in part; the USA's Motion for Leave to File Reply in Support of the USA's Motion for an Award of Civil Penalties, ECF No. 162, is GRANTED; Plaintiffs' Request for Delay of Entry of Judgment and Request for Additional Time to File Plaintiffs' Motion for Attorneys' Fees and Costs, ECF No. 189, is MOOT in light of this Order; Private Plaintiffs' Motion for Reasonable Attorneys' Fees and Litigation Expenses, ECF No. 190, is DENIED without prejudice; the City's Motion to Extend Deadline to Respond to Attorneys' Fees Motion,

ECF No. 191, is DENIED without prejudice; the Plaintiffs' Motion for Entry of Final Judgment on the Jury's Verdict, ECF No. 196, is GRANTED in part and DENIED without prejudice in part; and Plaintiffs' Motion for Status Conference, ECF No. 197, is MOOT in light of this Order.

Plaintiffs are awarded $53,654.50 in prejudgment interest; the Court imposes a civil penalty of $61,982.50 against the City; and the Court enters equitable relief (1) preventing the City from evicting the residents of 2328 S. Noble, (2) prohibiting the City from enforcing the spacing rule against group homes with five or fewer individuals, (3) requiring City officials attend FHA training, and (4) requiring record keeping enabling the USA's inspection for FHA compliance, pursuant to the terms of the forthcoming standalone injunctive order.

The Clerk is directed to file the USA's reply, ECF No. 162-1 on the docket, enter judgment, and close the case. Plaintiffs may file a renewed motion for attorneys' fees, to which Defendants will have two weeks to respond.

Entered this 5th day of December, 2023.

s/ Sara Darrow
_____
SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE
